**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DISH NETWORK CORPORATION and | : | |
| DISH NETWORK L.L.C., | : | |
| Plaintiffs, | : | Case No. 16-cv-04011- ALC-GWG |
| v. | : | |
| | : | |
| ACE AMERICAN INSURANCE | : | |
| COMPANY, | : | |
| Defendant. | : | |
| | : | |

---

### ACE AMERICAN INSURANCE COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

---

**COZEN O'CONNOR**
Adam Stein
E-mail:  adamstein@cozen.com
45 Broadway, 16th Floor
New York, New York 10006
Telephone:  212-453-3728

Thomas M. Jones
E-mail:  tjones@cozen.com
*admitted pro-hac vice*
Terri A. Sutton
Email:  tsutton@cozen.com
*admitted pro-hac vice*
999 Third Avenue, Suite 1900
Seattle, Washington 98104
Telephone:  206-340-1000

Attorneys for Defendant, ACE
American Insurance Company

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................. 1

ARGUMENT ....................................................................................................... 5

ACE IS ENTITLED TO SUMMARY JUDGMENT DENYING DISH'S CLAIM
FOR COVERAGE ............................................................................................... 5

   A.  Legal Standards ........................................................................................... 5

      1.  The Summary Judgment Standard ....................................................... 5
      2.  Colorado's Substantive Law Applies ................................................... 6
      3.  Rules of Contract Interpretation ........................................................... 8

   B.  The Media Exclusion Unambiguously Bars Coverage for DISH's Claim ........................ 9

      1.  DISH's Repeated Characterization of its Business as Involving Broadcasting
Renders any Claim That It Is Not "In The Business Of Broadcasting" Per Se
Unreasonable ........................................................................................ 10

          a)  Judicial Statements and Admissions .......................................... 11
          b)  Corporate Documents and Public Disclosure Statements ............ 12
          c)  Operations and Product Offering Statements .............................. 13

      2.  The Business in Which DISH Is Engaged Falls Squarely Within the Meaning of
"Broadcasting" ..................................................................................... 14

      3.  The ACE Policy's Structure Confirms DISH Could Not Reasonably Expect
Coverage for the Network Lawsuits. ..................................................... 15

      4.  DISH's Attempted Statutory Gloss on the Plain Meaning of "Business of
Broadcasting" Is Without Textual Support and Has Previously Been Rejected. ....... 18

      5.  "An Insured Whose Business Is . . . Telecasting" ..................................... 21

      6.  DISH's Other Arguments Are Similarly Misplaced and Have Been Rejected by
Colorado Courts. ................................................................................... 22

          a)  Reliance on Dictionary Definitions Debunked .......................... 22
          b)  DISH's "Classification Code" Arguments Have Also Been Rejected ............... 23
          c)  Subscription v. Non-Subscription:  DISH's "Pay" Versus "Free" Argument
Fails ....................................................................................... 25
          d)  The Parties' Reasonable Expectations Do Not Support Coverage In This Case .. 25

CONCLUSION ................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Am. Ins. Co. v. DISH Network LLC* ("*DISH I*"),
   173 F. Supp. 3d 1128 (D. Colo. 2016), *aff'd on other grounds*, 883 F.3d 881
   (10th Cir. 2018) .......................................................................................................... *passim*

*ACE Am. Ins. Co. v. DISH Network LLC* ("*ACE v. DISH*"),
   883 F.3d 881 (10th Cir. 2018) ...................................................................................9

*Admiral Ins. Co. v. Travelers Cas. & Sur. Co. of Am.*,
   881 F. Supp. 2d 570 (S.D. N.Y. 2012)........................................................................6

*Allstate Intravcos. Co. v. Huizar*,
   52 P.3d 816 (Colo. 2002)...........................................................................................19

*Allstate Ins. Co. v. Juniel*,
   931 P.2d 511 (Colo. App. 1996) ..................................................................................9

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986).................................................................................................5, 6

*Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.*,
   633 P.2d 1081 (Colo. 1981) .......................................................................................19

*Cary v. Hanna*,
   108 P.3d 288 (Colo. 2005)...........................................................................................9

*Cary v. United of Omaha Life Ins. Co.*,
   108 P.3d 288 (Colo. 2005) ...........................................................................................9

*Certain Underwriters of Lloyd's of London v. Foster Wheeler*,
   36 A.D.3d 17 (1st Dept. 2006)..................................................................................7,8

*Clarke v. Travco Ins. Co.*,
   No. 13-CV-5140 (NSR), 2015 WL 4739978 (S.D. N.Y. Aug. 7, 2015) ................24

*Compass Ins. Co. v. City of Littleton*,
   984 P.2d 606 (Colo. 1999).......................................................................................8, 9

*DISH Network Corp. v. Arch Specialty Ins. Co.*,
   989 F. Supp. 2d 1137 (D. Colo. 2013), *aff'd sub nom*, *DISH Network Corp. v.
   Arrowood Indem. Co.*, 772 F.3d 856 (10th Cir. 2014).................................... *passim*

*DISH Network Corp. v. Arrowood Indem. Co.*,
   772 F.3d 856 (10th Cir. 2014)  .................................................................... *passim*

*DISH Network L.L.C. v. Vicxon Corp.*,
  923 F. Supp. 2d 1259 (S.D. Cal. 2013).................................................................10

*EchoStar Satellite L.L.C. v. Viewtech, Inc.*,
  543 F. Supp. 2d 1201 (S.D. Cal. 2008).................................................................10

*Fed. Ins. Co. v. Tokio Marine & Fire Ins. Co.*,
  572 N.Y.S.2d 306 (1st Dept. 1991) ......................................................................19

*Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*,
  10 F. Supp. 3d 460, 497 (S.D. N.Y. 2014) ........................................................7, 8

*Fireman's Fund Ins. Co. v. Schuster Films, Inc.*,
  811 F. Supp. 978 (S.D. N.Y. 1993) ........................................................................6

*Gen. Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co.*,
  205 P.3d 529 (Colo. App. 2009) ...........................................................................21

*Hayut v. State Univ. of N.Y.*,
  352 F.3d 733 (2d Cir. 2003)....................................................................................6

*Huckabee v. Time Warner Ent.*,
  19 S.W.3d 413 (Tex. 1999).....................................................................................25

*In re:  Liquidation of Midland Ins. Co.*,
  16 N.Y.3d 536 (2011) .............................................................................................6

*Mgm't Specialists Inc. v. Northfield Ins. Co.*,
  117 P.3d 32 (2004)...................................................................................................9

*Mid-Century Ins. Co. v. Robles*,
  271 P.3d 592 (Colo. App. 2011)..............................................................................9

*MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*,
  435 F. Supp. 2d 285 (S.D. N.Y 2006)......................................................................5

*Orth-O-Vision, Inc. v. Home Box Office, Time, Inc.*,
  474 F. Supp. 672 (S.D. N.Y. 1979) .......................................................................25

*Pepcol Mfg. Co. v. Denver Union Corp.*,
  687 P.3d 1310 (Colo. 1984) ..................................................................................24

*Pompa v. Am. Family Mut. Ins. Co.*,
  520 F.3d 1139 (10th Cir. 2008) .......................................................................22, 25

*Progressive Specialty Ins. Co. v. Hartford Underwriters Ins. Co.*,
  48 P.3d 470 (Colo. App. 2006)..............................................................................21

39836093\1

*Pub. Serv. Co. of Colo. v. Wallis & Cos.*,
    986 P.2d 924 (Colo. 1999) ......................................................................................9

*Safeco Ins. Co. of Am. v. Robertson*,
    994 P.2d 488 (Colo. App. 1999) .........................................................................9, 19

*Snyder v. Nat'l Union Fire Ins. Co.*,
    688 F. Supp. 932 (S.D. N.Y. 1988) .........................................................................6

*Sprangers v. Greatway Ins. Co.*,
    182 Wis. 2d 521, 514 N.W.2d 1 (1994)...................................................................22

*Travelers Indem. Co. v. Howard Elec.*,
    879 P.2d 431 (Colo. App. 1994) ..............................................................................9

*Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*,
    No. 12-03098, 2014 WL 1217668 (C.D. Ill. Mar. 24, 2014)...................................22

*U.S. Underwriters Ins. Co. v. Zeugma Corp.*,
    No. 97-Civ-8031, 1998 WL 633679 (S.D. N.Y. Sept. 15, 1998) .............................5

*Village Homes of Colo., Inc. v. Travelers Cas. & Sur. Co.*,
    148 P.3d 293 (Colo. App. 2006) ..........................................................................8, 19

*Weight Loss Healthcare Ctrs. of Am., Inc. v. Office of Pers. Mgmt.*
    655 F.3d 1202 (10th Cir. 2011) ..............................................................................20

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
    84 N.Y.2d 309 (1994) ...............................................................................................6

**Statutes**

47 U.S.C. § 303c.............................................................................................................22

**Other Authorities**

Fed. R. Civ. P. 56.........................................................................................................1, 5

Shaun McParland Baldwin et al., "Commercial General Liability Coverages, An Overview",
    707 PLI/Lit 83, 188 (2004) ...............................................................................17, 31

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DISH NETWORK CORPORATION and | : | |
| DISH NETWORK L.L.C., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Case No.  1:16-cv-04011-ALC-GWG |
| ACE AMERICAN INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |
| | : | |

**ACE AMERICAN INSURANCE COMPANY'S MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Defendant, ACE American Insurance Company ("ACE") submits this memorandum of law in support of its motion, pursuant to Fed. R. Civ. P. 56 for an order (1) dismissing Plaintiffs' complaint (a) for failure to state a claim upon which relief can be granted and (b) because no genuine issue of material fact exists requiring a trial of any such claim, and (2) granting ACE's Counterclaim for declaratory relief, together with such other and further relief as the Court deems just and proper.[1]

**PRELIMINARY STATEMENT**

This insurance coverage dispute turns in significant part on whether DISH qualifies as a "broadcaster" or "telecaster" within the plain meaning of ACE's policy.  Because the answer to this question is yes, numerous categories of copyright infringement claims are excluded from coverage and no duty to defend or indemnify the underlying Network Lawsuits exists.  In multiple

---

[1]   Copies of the pleadings, exhibits and deposition testimony in support of this motion are contained in ACE's Rule 56.1 Statement of Undisputed Material Facts ("SOF") to which the Court respectfully is referred.  As used herein, capitalized terms carry the same meaning attributed to them in the SOF.

instances, across multiple jurisdictions, DISH has been found to be a "broadcaster."  As succinctly

stated by U.S. Senior District Judge Kane in another DISH suit brought against its insurers:

> For DISH to hold itself out to the public and the courts as a "broadcaster" but then deny the same to avoid its insurers' broadcasting exclusion smacks of hypocrisy and not common sense or understanding.
>
> \*   \*   \*
>
> Simply put, DISH provides television programming to a vast population and is therefore a broadcaster [and for that matter a "telecaster"].  DISH implicitly agrees through its history of calling itself a broadcaster.  It now deems it expedient to plump up its definition by reminding the court . . . that it is a "*direct satellite broadcaster*", but it is a self-proclaimed broadcaster nonetheless.[2]

Ignoring this reality, DISH attempts the same legerdemain here, insisting that it "is not in

the business of 'broadcasting' or 'telecasting,'" but rather is in the "business of providing direct-

to-the-home satellite television products and services to paying subscribers."[3]  For this reason and

because subscription television is classified as a non-broadcast service for purposes of the 1934

Federal Communications Act, DISH argues it is not engaged in the business of "broadcasting" or

"telecasting" within the plain meaning of the ACE Policy's "Insureds in Media And Internet

Businesses" exclusion (the "Media Exclusion").[4]  No less than six insurance professionals, within

*and outside of* ACE, familiar with DISH's business and the ACE Policy's terms, including DISH's

---

[2]   *DISH Network Corp. v. Arch Specialty Ins. Co*., 989 F. Supp. 2d 1137, 1148, 1155 n.15 (D. Colo. 2013) (emphasis added), *aff'd sub nom*, *DISH Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856 (10th Cir. 2014).

[3]   Dkt. 144 at 3.

[4]   The "Media Exclusion" as used herein refers to Exclusion j. in Coverage B of the ACE Policy and provides in relevant part:

This insurance does not apply to:

\*   \*   \*

j.        Insureds In Media And Internet Type Businesses:

"Personal and advertising injury" committed by an insured whose business is:

(1)      Advertising, broadcasting, publishing or telecasting . . . .

Ex. 14 at 15.

own broker, Lockton Companies LLC ("Lockton") have concluded otherwise, conveying in real time communications and notes, their independently held views that no coverage for the Network Lawsuits exists.  All three courts in DISH's home state of Colorado that have considered the issue (two at the district level and the Tenth Circuit Court of Appeals) have agreed.[5]

Given Lockton's recurring advice that the Media Exclusion was a "Major Exclusion" and that DISH should consider separate "Broadcaster's Errors & Omissions" insurance to fill in the coverage gap created, their unanimity on this point is not surprising.[6]  The reason of course is clear, based on the Media Exclusion's unambiguous wording, the Policy's further exclusion of personal and advertising injury due to "Broadcasting Services,"[7] and DISH's own innumerable references to its business as involving "broadcasts" and "broadcasting," leading inexorably to the conclusion expressed by the Judge Kane "that the plain meaning of broadcasting includes the business of providing satellite television programming, in which DISH is primarily engaged."[8]

For all its pretend complexity, this case really is quite simple, resting as it does on the narrow question of whether an exclusion for "'[p]ersonal and advertising injury' committed by an insured whose business is . . . broadcasting . . . or telecasting" is ambiguous, based on DISH's strained reading of "business of broadcasting" as referring only to "broadcast licensees" qualified as such under the Federal Communications of Act of 1934.  Three closely-reasoned decisions have rejected this aberrant policy interpretation approach, finding the same or similarly worded exclusions to be unambiguous, and dismissing as meritless DISH's "statutory definition" argument

---

[5]   *See Arch Specialty*, 989 F. Supp. 2d 1137; *Arrowood*, 772 F.3d 856; *ACE Am. Ins. Co. v. DISH Network LLC* ("*DISH I*"), 173 F. Supp. 3d 1128, 1138 (D. Colo. 2016), *aff'd on other grounds*, 883 F.3d 881 (10th Cir. 2018) (*ACE v. DISH*).

[6]   *See* SOF at ¶¶ 8-11, 13-14, and 40.

[7]   Ex. 14 at 68, Endorsement 19.

[8]   *See* SOF at ¶¶ 2, 5, 8-11, 13-16, 20-21, 35, 33-36, and 38; *See also*, *Arch Specialty*, 989 F. Supp. 2d at 1148.

39836093\1

"where [the Court's] focus is on the commonly understood definition of the term 'broadcasting.'"[9] Significantly, one of these cases dealt with the same exclusion in the same ACE Policy at issue here and found no coverage as a matter of law.[10]

It is undisputed that DISH's business operations have not changed since *DISH I* was decided, or for that matter since 2011 when the ACE Policy was issued. Then as now, that business principally involves the broadcasting of thousands of channels of television programming to millions of customers nationwide via DISH's "Direct Broadcast Satellite" ("DBS") system.[11] As stated by DISH at the time:

> The principal digital broadcast operations facilities we use are EchoStar's facilities located in Cheyenne, Wyoming, and Gilbert, Arizona. We also use five regional digital broadcast operations facilities owned and operated by EchoStar that allow us to maximize the use of spot beam capabilities of certain owned and leased satellites . . . . In connection with the Spin-off [of EchoStar], we entered into a broadcast agreement pursuant to which EchoStar provides certain broadcast services to us, including teleport services such as transmission and downlinking, channel origination services and channel management services . . . .[12]

In the Network Lawsuits, the four major television networks alleged that DISH, through its "Hopper" product, infringed on the networks' exclusive reproduction rights in violation of The Copyright Act, 17 U.S.C. § 101 *et seq.*, by making their copyrighted programming available to DISH's customers without commercials in breach of the parties' "re-broadcast" agreements.[13] Given the self-described broadcast-centric nature of DISH's "digital broadcast operations," no

---

[9]   *See Arrowood*, 772 F.3d at 870; *Arch Specialty*, 989 F. Supp. 2d at 1148 ("The fact that subscription television is classified as a non-broadcast service for purposes of the Federal Communications Act says nothing about the plain, ordinary meaning of the term 'broadcasting' in general."); *DISH I*, 173 F. Supp. 3d at 1138.

[10]  *See DISH I*, 173 F. Supp. 3d at 1138 (holding that it was bound by the Tenth Circuit's decision in *Arrowood* that "the commonly-understood definitions of the terms 'broadcasting' and 'telecasting' undoubtedly encompass DISH's transmissions," and that the same Media Exclusion at issue before this Court "excludes DISH from coverage under Coverage B.").

[11]  SOF at ¶¶ 2, 33-36, 38-39.

[12]  SOF at ¶ 33, Ex. D-7 at 2.

[13]  SOF at ¶¶ 1, 3, 17.

triable issue exists regarding those operations or how DISH has characterized them publically and to ACE.  In light of these pronouncements, the fundamental reality of what DISH's business actually is cannot be gainsaid, nor the Media Exclusion's express language unambiguously barring claims of copyright infringement "committed by an insured whose business is . . . *broadcasting* . . . or *telecasting*."  No issue exists that the Network Lawsuits for which DISH seeks coverage were copyright infringement claims, thus eliminating any possibility of coverage under ACE's Policy.  For this reason and the other reasons set forth below, ACE's motion for an order dismissing DISH's Amended Complaint and declaring that ACE has no coverage obligations in connection with the Network Lawsuits, should be granted and DISH's declaratory judgment action dismissed.

## <u>ARGUMENT</u>

### ACE IS ENTITLED TO SUMMARY JUDGMENT <u>DENYING DISH'S CLAIM FOR COVERAGE</u>

**A.     Legal Standards**

**1.     The Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c).  Whether a fact is "material" is determined by the substantive law defining the claims.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  "Where parties on a summary judgment motion do not dispute a dispositive material fact and merely disagree as to the consequence of that undisputed fact under law, a question of law is presented for the court's interpretation and the court could not be on firmer ground in granting summary judgment as a matter of law."  *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 305 (S.D. N.Y. 2006); *see also*, *U.S. Underwriters Ins. Co. v. Zeugma Corp*., No. 97-Civ-8031, 1998 WL 633679, at *2 (S.D. N.Y. Sept. 15, 1998) ("Summary judgment is appropriate where all facts are undisputed and only questions of law remain to be decided.").  "The mere existence of a scintilla of evidence in support of the [non-

movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 743 (2d Cir. 2003); *see also*, *Anderson*, 477 U.S. at 247–48 ("[T]he mere existence of *some* alleged factual dispute between the parties alone will not defeat an otherwise properly supported motion for summary judgment . . . ."). (Emphasis in original).  Interpretation of an insurance policy is a question of law properly decided on a motion for summary judgment if the policy is unambiguous.  *See*, *e.g.*, *Admiral Ins. Co. v. Travelers Cas. & Sur. Co. of Am.*, 881 F. Supp. 2d 570, 574–75 (S.D. N.Y. 2012).

ACE is entitled to summary judgment because there is no genuine issue that:  (1) no ambiguity exists regarding the plain meaning of "business of broadcasting" and/or "business of telecasting" as used in the ACE Policy in the context of DISH's business; and (2) the *DISH I* Court's holding that the Tenth Circuit's ruling in *Arrowood*—that "the commonly-understood definitions of the terms 'broadcasting' and 'telecasting' undoubtedly encompass DISH's transmissions"—is binding precedent that applies equally to the same ACE Policy at issue in this case.  *DISH I*, 173 F. Supp. 3d at 1138.

## 2.    Colorado's Substantive Law Applies

"Sitting in diversity, this Court applies the choice of law rules of the forum state—New York." *O'Neill v. Yield House*, 964 F. Supp. 806, 809 (S.D. N.Y. 1997) (citing *Bader v. Purdom*, 841 F.2d 38, 39 (2d Cir. 1988)); *see also*, *Fireman's Fund Ins. Co. v. Schuster Films, Inc.*, 811 F. Supp. 978, 982 (S.D. N.Y. 1993).  "New York courts have traditionally resolved choice of law issues involving insurance policies by applying the law of the state which the parties understood would be the principal location of the risk." *Snyder v. Nat'l Union Fire Ins. Co.*, 688 F. Supp. 932, 934–935 (S.D. N.Y. 1988).  The purpose of this test "is to establish which State has 'the most significant relationship to the transaction and the parties.'" *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994) (quoting RESTATEMENT [SECOND] OF CONFLICT OF LAWS § 188 [1]).

"[I]n cases involving liability insurance covering multistate risks, we regard the state of the insured's domicile to be a proxy for the principal location of the insured risk, which under New York law and Restatement § 193, *is the controlling factor in determining the law applicable to a liability insurance policy*[.]"  *Certain Underwriters of Lloyd's of London v. Foster Wheeler*, 36 A.D.3d 17, 26–27 (1st Dept. 2006) (emphasis supplied).  *See also*, *In re:  Liquidation of Midland Ins. Co.*, 16 N.Y.3d 536, 544 (2011) (noting Court's recent affirmance of the "grouping of contacts approach," and decisions holding that when "necessary to determine the law governing a liability insurance policy covering risks in multiple states, the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk.").

Adherence to New York's "grouping of contacts" approach also "minimizes the likelihood that contemporaneous policies will be deemed governed by the laws of different states" and ensures "that consistent and uniform results will be reached in different cases."  *Foster Wheeler*, 36 A.D.3d at 23–24 (observing that this approach promotes "certainty, predictability and uniformity of result" in that "[t]he state of the insured's domicile is a fact known to the parties at the time of contracting, and (in the absence of a contractual choice-of-law provision) application of the law of that state is most likely to conform to their expectations."); *see also*, *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 10 F. Supp. 3d 460, 497 (S.D. N.Y. 2014) ("The rule minimizes the likelihood that contemporaneous policies will be deemed governed by the laws of different states and makes it more likely that consistent and uniform results will be reached in different cases.")

Applying these choice of law principles here, Colorado law clearly applies to this coverage dispute.  Colorado is the state of DISH's domicile and principal place of business,[14] and the ACE Policy was issued to DISH in Colorado through a Colorado producer.[15]   DISH's risk manager, Jennifer Palasz, negotiated and contracted for the ACE Policy with DISH's Colorado broker, Lockton, and works out of DISH's Colorado corporate office.  The ACE Policy covers DISH's

---

[14]   SOF at ¶ 2 n.2, Exs. A-C.

[15]   Ex. 14 at 1.

operations nationwide, providing that ACE "will pay the insured [DISH]" for covered losses.[16]

Thus, according to the terms of the ACE Policy, any payments made thereunder would be paid to

DISH in Colorado for the purpose of protecting DISH's assets and balance sheet, making Colorado

the location with the most significant relationship to the ACE Policy and the law this Court should

apply to questions of interpretation.

Importantly, the application of Colorado law in this case also furthers one of the central

goals of choice of law analysis, "certainty, predictability and uniformity of result." *Foster

Wheeler*, 36 A.D.3d at 23–24; *Fireman's Fund v. Great Am.*, 10 F. Supp. 3d at 497.  In *DISH I*,

DISH agreed that Colorado law applied to the interpretation of the same ACE Policy at issue here

and even filed a motion to certify questions of policy interpretation to the Colorado Supreme Court,

including the question of the applicability of the Media Exclusion to its business.[17]  Concluding

that the exclusion applied to DISH's business as a matter of law, the *DISH I* Court barred coverage

for the invasion of privacy claims in that case.  *DISH I*, 173 F. Supp. 3d at 1138.[18]  In light of New

York's policy of seeking to ensure "consistent and uniform results," when deciding which state's

law governs questions of policy interpretation, even without the various other choice of law factors

weighing heavily in Colorado's favor, Colorado law is the obvious and correct choice in this case.

### 3.    Rules of Contract Interpretation

An insurance policy is a contract interpreted "consistently with the well settled principles

of contract interpretation."  *Compass Ins. Co. v. City of Littleton*, 984 P.2d 606, 613 (Colo. 1999).

A court's "construction of the policy provisions must be fair, natural and reasonable rather than

---

[16]    *Id.* at 23, 14.

[17]    Declaration of Terri A. Sutton in Support of ACE's Motion for Summary Judgment ("Sutton Decl.") at
¶ 18, Ex. Q, Combined Motion and Memorandum of DISH Network, L.L.C. to Withdraw Its Motion
to Dismiss, Certify Questions to the Supreme Court of Colorado and to Stay Proceedings ("DISH's
Motion to Certify"), as filed with the United States District Court for the District of Colorado in the
case *ACE American Insurance Co. v. DISH Network L.L.C.,* Case No. 1:13-cav-00560-REB-MEH, on
December 6, 2013, as Dkt. 41.

[18]    *See also*, *Arrowood*, 772 F.3d at 872 (finding Media Exclusion applied to bar coverage for patent
infringement under Coverage B).

strained or strictly technical." *Village Homes of Colo., Inc. v. Travelers Cas. & Sur. Co.*, 148 P.3d 293, 296 (Colo. App. 2006). "Words used in an insurance policy should be given their plain and ordinary meaning" and "interpreted according to the understanding of the average purchaser of insurance." *Compass*, 984 P.2d at 613, 617. Courts should not "rewrite insurance policy provisions that are clear and unambiguous." *Id.* at 613.

Although a true ambiguity is construed against an insurer, a policy provision is not ambiguous merely because the parties disagree as to its interpretation. *Pub. Serv. Co. of Colo. v. Wallis & Cos.*, 986 P.2d 924, 939 (Colo. 1999) (a policy is not ambiguous merely because a party develops an unreasonable or strained interpretation of the language.); *Cary v. Hanna*, 108 P.3d 288, 290 (Colo. 2005); *Mgm't Specialists Inc. v. Northfield Ins. Co.*, 117 P.3d 32, 35–36 (2004); *Safeco Ins. Co. of Am. v. Robertson*, 994 P.2d 488, 490 (Colo. App. 1999). Rather, a provision is ambiguous only if it is objectively susceptible to more than one reasonable interpretation within the context of the policy as a whole. *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 291 (Colo. 2005); *Robertson*, 994 P.2d at 490; *Allstate Ins. Co. v. Juniel*, 931 P.2d 511, 513 (Colo. App. 1996) ("whether a term is ambiguous is not determined in a vacuum but by use of an objective standard within the context"). Extrinsic evidence cannot be used to create an ambiguity that would not otherwise exist. *Travelers Indem. Co. v. Howard Elec.*, 879 P.2d 431, 435 (Colo. App. 1994).

**B.     The Media Exclusion Unambiguously Bars Coverage for DISH's Claim**

Few principles are better settled in insurance law and policy interpretation than the proposition that unless otherwise defined, "words used in an insurance policy should be given their plain and ordinary meaning." *ACE v. DISH*, 883 F.3d at 887 (quoting *Compass*, 984 P.2d at 613, 617). Like the policies at issue in *Arrowood* and *DISH I*, neither "broadcasting" nor "telecasting" is expressly defined in the ACE Policy, nor is there any indication that, as used, these terms were "intended to have some special meaning peculiar to the insurance industry." *Mid-Century Ins. Co. v. Robles*, 271 P.3d 592, 596 (Colo. App. 2011). As a result, this Court, like the *Arrowood* and *DISH I* Courts before it, is "left with the task of 'constru[ing] [these terms] in

[their] commonly used sense.'" *Arrowood*, 772 F.3d at 868 (quoting *Robles*, 271 P.3d at 596). Agreeing with the district court that the term "broadcasting, as used in the policies [before it], was synonymous with transmission," the *Arrowood* Court similarly concluded that "[t]here [was] no question that DISH transmits via broadcast satellites, television programming to its subscribers." *Arrowood*, 772 F.3d at 868 (quoting *Arch Specialty*, 989 F. Supp. 2d at 1147).[19]  Other courts that have considered the issue have similarly found that DISH is engaged in broadcasting.  *See, e.g.*, *EchoStar Satellite L.L.C. v. Viewtech, Inc.*, 543 F. Supp. 2d 1201, 1207 (S.D. Cal. 2008) (EchoStar's "direct-to-home satellite services" involves the "*broadcasting* of programming or services by satellite") (emphasis in original); *DISH Network L.L.C. v. Vicxon Corp.*, 923 F. Supp. 2d 1259, 1261–62 (S.D. Cal. 2013) ("DISH Network's high-definition programming, [] is *broadcast*") (emphasis added).

   1.   **DISH's Repeated Characterization of its Business as Involving Broadcasting Renders any Claim That It Is Not "In The Business Of Broadcasting" Per Se Unreasonable.**

   As the litany of evidence identified in *Arch Specialty*, *Arrowood*, and *DISH I* confirms, DISH has repeatedly and consistently represented to the courts, the public, and to its investors that it is engaged in the business of broadcasting.  Its sole claimed public statement to the contrary, buried deep within its annual report in a single paragraph titled "Rules Relating to Broadcast Services"—that because "[t]he FCC imposes different rules for 'subscription' and 'broadcast' services.  We believe that because we offer a subscription programming service, we are not subject to many of the regulatory obligations imposed upon broadcast licensees"[20]—says nothing of the

---

[19]   Jeffrey Blum, DISH's Senior Vice President for public policy and regulatory affairs agreed insofar as DISH's own usage of the term "broadcasting" is concerned, that it too was meant in "the transmission, distribution sense."  See SOF at ¶ 38, Ex. P, Blum Dep. at 127:12–15.  As Mr. Blum explained:

> In my mind, and on behalf of the company, when . . . we say we broadcast channels or transmit channels or distribute channels or we broadcast channels are all synonyms for taking the signal of programmers that we license and transmitting them via satellite to subscribers for a fee.  *Id.* at 21:7–14.

[20]   Ex. D-7 at 10.

kind and is absolutely opaque in terms of meaningfully describing the actual nature of DISH's business.[21]  Moreover, apart from not even using the phrase "business of broadcasting" in the very statement DISH claims informs the public—and ACE—that this is not the business it actually is in, a literal tsunami of contrary statements confirms that no genuine issue exists that exactly the opposite is the case.  These include:

a)      **Judicial Statements and Admissions:**

- "DISH Network uses high-powered satellites to **broadcast** . . . movies, sports, and general entertainment services . . . to consumers";[22]

- DISH and its vendors "have developed and employ a robust Security System aimed at protecting the copyrighted programming **broadcast** on DISH Network's satellite signals";[23]

- "The works **broadcast** by DISH Network are copyrighted";[24]

- "[DISH] enters into agreements with various content providers so that [DISH] may **broadcast its content on the DISH Network** ('Programming Agreements').  In the Programming Agreements, [DISH] gains contractual rights to **broadcast** material supplied by the content providers";[25]

- "[DISH] Programming . . . is **broadcast** solely for the use of [DISH] Subscribers";[26] and

- "[DISH] Programming is **broadcast** by satellite."[27]

---

[21]    Ex. E, Schaper Dep. at 119:23–25 ("So I would have [read statement to say] they [DISH] had the exposure of a broadcast[er] if I'm reading this as a broker.").

[22]    SOF at ¶ 36 n.56 (emphasis added).

[23]    SOF at ¶ 36 n.57 (emphasis added).

[24]    SOF at ¶ 36 n.58 (emphasis added).

[25]    SOF at ¶ 36 n.59 (emphasis added).

[26]    SOF at ¶ 36 n.60 (emphasis added).

[27]    SOF at ¶ 36 n.61 (emphasis added).

**b)**      **Corporate Documents and Public Disclosure Statements:**

- DISH's Articles of Incorporation state that its very "purpose" is "[t]o engage in the business of satellite communications, including but not limited **to Direct Broadcast Satellite communications** . . . ."[28];

- In its annual report for the year ending December 31, 2010, DISH described its principal business as follows:

  > DISH Network Corporation is a holding company. Its subsidiaries . . . operate the DISH Network® **direct broadcast satellite ("DBS")** subscription television service in the United States which had 14.133 million subscribers as of December 31, 2010. We have deployed substantial resources to develop the "DISH Network **DBS** System." The DISH Network **DBS** System consists of our licensed Federal Communications Commission ("FCC") authorized **DBS** and Fixed Satellite Service ("FSS") spectrum, our owned and leased satellites, receiver systems, third-party **broadcast** operations, customer service facilities, leased fiber network, in-home service and call center operations and certain other assets utilized in our operations.[29];

- The principal digital **broadcast** operations facilities we use are EchoStar's facilities located in Cheyenne, Wyoming, and Gilbert, Arizona. We also use five regional digital **broadcast** operations facilities owned and operated by EchoStar"[30];

- [W]e entered into a **broadcast** agreement pursuant to which EchoStar provides certain **broadcast** services to us, including teleport services such as transmission and downlinking, channel origination services and channel management services"[31];

- "[D]uring January 2011, the satellite [EchoStar VIII] experienced an anomaly, which temporarily disrupted electrical power to some components causing an interruption of **broadcast** service"[32];

- To combat signal theft and improve the security of our **broadcast** system, we completed the replacement of our security access devices to re-secure our system during 2009"[33];

---

[28]   SOF at ¶¶ 2, 33, Ex. A (emphasis added).

[29]   SOF at ¶ 33 n.44 (emphasis added).

[30]   SOF at ¶ 33 n.45 (emphasis added).

[31]   SOF at ¶ 33 n.46 (emphasis added).

[32]   SOF at ¶ 33 n.47 (emphasis added).

[33]   SOF at ¶ 33 n.48 (emphasis added).

- "[G]iven that all of our HD content is **broadcast** in MPEG-4, any growth in HD penetration will naturally accelerate our transition to these new technologies and may increase our subscriber acquisition and retention costs"[34]; and

- Revenue from our subscription television services is recognized when programming is **broadcast** to subscribers[.]"[35]

DISH makes similar statements in virtually of its public filings from 2004 to 2017.[36]

c)    **Operations and Product Offering Statements:**

- DISH's website identifies "milestones" in its broadcasting business: "March 1996: [T]he company made its first **broadcast** to customers from the Cheyenne Uplink Center. . . . May 2010:  DISH becomes the first pay-TV provider to offer local **broadcast** channels in all 210 local television markets in the U.S."[37];

- "DISH . . . today announced that it is the only television provider in the U.S. to **broadcast** the entire Indian Premier League (IPL) cricket tournament[.]"[38];

- DISH offers "more than 280 basic video channels, 60 Sirius Satellite Radio music channels, 30 premium movie channels, 35 regional and specialty sports channels, 2,800 local channels, 250 Latino and international channels, and 55 channels of pay-per-view content"[39]; and

- To maintain its digital broadcast facilities and operations, DISH employs a cadre of highly skilled technicians and engineers, led by Executive Vice President of Engineering and **Broadcast**, Jeff McSchooler, who DISH describes as "lead[ing] a team . . . responsible for **broadcasting** over 7,000 satellite television channels."[40]

The discrepancy between DISH's public pronouncements and the positions taken by it in

opposition to the Media Exclusion's application, like those which engendered the *Arch Specialty*

Court's "hypocrisy" slap, speaks for itself and requires no elaboration.

---

[34]   SOF at ¶ 33 n.49 (emphasis added).

[35]   SOF at ¶ 33 n.51 (emphasis added).

[36]   SOF at ¶ 33 n.52.

[37]   SOF at ¶ 33 n.53 (emphasis added).

[38]   SOF at ¶ 33 n.54 (emphasis added).

[39]   SOF at ¶ 33 n.50.

[40]   SOF at ¶ 33 n.55 (emphasis added).

2. **The Business in Which DISH Is Engaged Falls Squarely Within the Meaning of "Broadcasting."**

The ACE claims adjusters and DISH's own brokers at Lockton testified without qualification that they considered DISH to be in the business of broadcasting and/or telecasting within their understanding of the plain meaning of those terms. As Robert Joyce, the ACE claims adjuster who authored ACE's July 31, 2012 denial of coverage explained, ACE's "disclaimer was based on the fact that [DISH's] business is broadcasting. That's what DISH does. They broadcast."[41] Kerri Lefferts, the second ACE claims adjuster who analyzed DISH's claim when it was inadvertently resubmitted for consideration by Gallagher Bassett months after ACE's initial denial, echoed this view, stating she determined DISH was "in the business of broadcasting and telecasting . . . . They are a cable service provider and they broadcast information to . . . millions and millions of customers."[42] Alison Walz, Ms. Lefferts' supervisor testified to her own and ACE's understanding of DISH's "business as disseminating televised content to . . . millions of people. . . . Based on the plain meaning of the terms . . . I think DISH's business is broadcasting. That is the core of their purpose. That was our understanding."[43]

Elizabeth Booth, the Lockton broker principally responsible for handling the DISH account, likewise confirmed her own and Lockton's similarly held view that "[i]f they [DISH] . . . are broadcasting media or content my understanding was they would be in the business of broadcasting" based on the term's commonly understood meaning.[44] Lockton's understanding of DISH's business, the ACE Policy's terms, and the nature of the underlying Network Plaintiffs'

---

[41] SOF at ¶ 21.

[42] Ex. K, Lefferts Dep. at 89:13—15.

[43] Ex. N, Walz Dep. at 145:13–15. ACE's underwriter, Erwin Montoya agreed with this criteria when stating his own understanding of DISH's business, testifying that "a company is in the business of [] broadcasting, if that is their primary operation, they derive income from it." Ex. I, Montoya Dep. at 18:10–12; Michelle Schaper, the Lockton broker who preceded Ms. Booth on the DISH account, held a similar, real world view, stating: "I just thought of them [DISH] as a TV broadcaster, and I don't know that -- other than what we hashed out [] that's what they do for a living." Ex. E, Schaper Dep. at 82:4–7.

[44] Ex. G, Booth Dep. at 252:24–253:1.

39836093\1

claims, the unchallenged fact of Mr. Joyce's conversation with Lockton reported in his July 27, 2012 file note, that "[t]he broker stated that *they and DISH* did not expect there was coverage under the ACE policy but needed a response" provides contemporaneous evidence of this jointly shared view.[45]

### 3. The ACE Policy's Structure Confirms DISH Could Not Reasonably Expect Coverage for the Network Lawsuits.

The ACE Policy's structure, together with Elizabeth Booth's testimony and contemporaneous "for discussion" comments regarding the 2011 policy, confirm that the policy could *not* reasonably be expected to cover the species of advertising/copyright injury claimed in the Network Lawsuits.[46]  The Policy itself is divided into two parts, "Coverage A. Bodily Injury And Property Damage Liability," covering the bodily injury and property damage claims mainly connected with DISH's installation and customer service operations (frequency-wise, the vast majority of DISH's claims year-to-year),[47] and "Coverage B. Personal And Advertising Injury Liability," covering claims more financial in nature associated with other aspects of DISH's business.  It is Coverage B that is at issue here, starting with Exclusion i, and its broad exclusion of "'[p]ersonal and advertising injury' arising out of the infringement of copyright, patent . . . or other intellectual property rights."[48]  By its terms, the exclusion "does not," however, "apply to infringement, in your 'advertisement', of copyright, trade dress or slogan," thereby conferring at

---

[45]  Ex. 4 at 4.  Only DISH's risk manager, Jennifer Palasz, disagreed, testifying to her understanding at the time she was deposed "that to be a broadcaster you have to be regulated by the FCC, which we're not."  When asked when it was that she first came to this view, Ms. Palasz was unable to say precisely, other than "it's been several years" and that her ersatz understanding arose only *after* discussions with DISH counsel in or about 2011 in connection with *DISH I.*  Ex. F, Palasz Dep. at 110:4–25; 111:6, 112:23–113:1.

[46]  *See* Ex. G, Booth Dep. at 297–300 discussed at notes 52, 54 *infra*.

[47]  Ex. I, Montoya Dep. at 30:18–25 ("99%" of DISH's "couple thousand losses a year" "fell within Coverage A for bodily injury and property damage" and "the vast majority of those claims" are "related to some aspect of the installation process").

[48]  Ex. 14 at 15.

39836093\1

least the possibility that this limited form of advertising-related copyright infringement might be covered.[49]

In the event a copyright claim falls within Exclusion i's exception, the Media Exclusion (Exclusion j) comes into play and broadly excludes from coverage "'[p]ersonal and advertising injury' committed by an insured whose business is:  (1) [a]dvertising, broadcasting, publishing or telecasting[.]"[50]  Like Exclusion i, Exclusion j also has an exception, and by its terms "does not apply to [claims falling under] Paragraphs 13a., b., and c. of 'personal and advertising injury' under the [Policy's] Definitions Section."[51]  As a result of this carve-back, the Policy thus restores coverage for "personal and advertising liability" for offenses personal in nature—"a. false arrest", "b. malicious prosecution" and "c. wrongful eviction"—that would normally be expected to involve a single or small group of claimants, while leaving intact the exclusion for offenses involving damages potentially far greater in reach, caused by the "oral or written *publication*" of offending statements or materials.  This latter category of offense, for which coverage **would not** apply, includes "d. slander and libel", e. violations of privacy rights, "f. the use of another's

---

[49]  *Id.*

[50]  *Id*.

[51]  *Id.* at 15, 25.  This definition reads as follows:

> 13.  "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
>
> a.  False arrest, detention or imprisonment;
>
> b.  Malicious prosecution;
>
> c.  The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;
>
> d.  Oral or written publication, in any manner, of material that slanders or libels a person or organization . . . ;
>
> e.  Oral or written publication, in any manner, of material that violates a person's right of privacy;
>
> f.  The use of another's advertising idea in your "advertisement"; or
>
> g.  Infringing upon another's copyright, trade dress or slogan in your "advertisement."

39836093\1

advertising idea in your 'advertisement'", and "g. infringing upon another's copyright . . . in your 'advertisement.'" *Id.* at 15; SOF ¶ 34, Ex. 147.[52]

For this reason and stated in a slightly different way, for insureds in the business of "advertising, broadcasting, publishing or telecasting," the Media Exclusion (Exclusion j) takes back the narrow "infringement, in your 'advertisement', of copyright, trade dress or slogan" exception to Exclusion i's otherwise blanket exclusion of copyright infringement claims, and in so doing restores completely Coverage B's total exclusion for copyright claims for such insureds.  As the *Arch Specialty* Court explained, the reason why an insurance company would "include an exclusion for insureds in the business of 'advertising, broadcasting, publishing or telecasting,'" "is to limit the insurer's exposure to *mass-media type injuries*."  *Arch Specialty*, 989 F. Supp. 2d at 1148 (emphasis added).[53]  The ACE Policy's inclusion of Exclusion j, together with its further exclusion by endorsement stating that "This insurance does not apply to . . . 'personal and advertising injury' due to the rendering of or failure to render [Broadcasting Services]", fulfills this purpose and comprises the "gap" in DISH's coverage that Lockton repeatedly recommended DISH fix via a separate "Broadcasters Errors & Omissions" policy.  It also, and importantly, evidences ACE's—and DISH's—"objectively reasonable expectation" that given the nature of

---

[52]  As Elizabeth Booth explained regarding her 2011 mark-up of the ACE Policy, she wrote "covered" next to the paragraphs a., b., and c. of the definition of "personal and advertising injury," and "excluded" next to paragraphs d., e., f., and g, because it was her and Lockton's understanding that these latter categories were excluded under the ACE Policy.  Ex. G, Booth Dep. at 297:4–5; 297:24–299:14.

[53]  Citing Shaun McParland Baldwin et al., "Commercial General Liability Coverages, An Overview", 707 PLI/Lit 83, 188 (2004) ("The insureds in [the advertising, broadcasting, publishing or telecasting] line of business should procure media, broadcasters or publishers liability policies to cover their enhanced risk in the media-related market place . . . .  This addition recognizes that these types of insureds also present a heightened risk of 'person [sic] and advertising injury,' which should be addressed by separate insurance products.").

DISH's broadcasting/telecasting business, no coverage for injuries of the sort claimed in the Network Lawsuits would be provided.[54]

### 4. DISH's Attempted Statutory Gloss on the Plain Meaning of "Business of Broadcasting" Is Without Textual Support and Has Previously Been Rejected.

When asked at his deposition, Mr. Joyce rejected the central fallacy of DISH's main argument that because subscription television is classified as a non-broadcast service for purposes of the 1934 Federal Communications Act, DISH is not engaged in the business of "broadcasting" within the plain meaning of the Media Exclusion. As he correctly observed:

> [t]he exclusion doesn't say that you have to be a regulated broadcasting business under federal law. It says if you are involved in broadcasting. It doesn't limit that to only people who are under federal control or have to respond to a federal agency.[55]

The *Arch Specialty* Court agreed, rejecting *in toto* DISH's argument that "because a federal court upheld a statutory interpretation of the term 'broadcasting' that takes the subscription television providers outside of the FCC's regulatory purview, the plain, ordinary meaning of the term 'broadcasting' cannot apply to subscription television providers." 989 F. Supp. at 1148. As the Court sensibly held:

> The fact that subscription television is classified as a non-broadcast service for purposes of the Federal Communications Act says nothing about the plain, ordinary meaning of the term "broadcasting" in general. Colorado law dictates that terms be interpreted according to the understanding of the average purchaser of insurance, and it is wholly irrelevant that "broadcasting" has a statutory definition in a regulatory scheme that excludes satellite television providers.

*Id. See also*, *Arrowood*, 772 F.3d at 871 ("the Act's statutory definition of 'broadcasting' and the FCC's interpretation and application of that statutory definition carry little weight in a case

---

[54] As Ms. Booth further explained, this also is why she wrote in her handwritten list of policy comments to note on Lockton's summary of insurance: "pg 8 of 20 P&I [personal injury] committed by insureds in the business of broadcasting," testifying that she made this notation for discussion purposes with DISH "because [she] thought it was an exclusion on the policy for DISH." Ex. G, Booth Dep. at 297:24–300:25; Ex. 147.

[55] Ex. J, Joyce Dep. at 187:22–188:1.

such as this, where our focus is on the commonly understood definition of the term 'broadcasting.'"); *accord Allstate Ins. Co. v. Huizar*, 52 P.3d 816, 819 (Colo. 2002) ("The words of the contract should be given their plain meaning according to common usage, and strained constructions should be avoided."); *Village Homes*, 148 P.3d at 296 (A court's "construction of the policy provisions must be fair, natural and reasonable rather than strained or strictly technical.").  Holding that "the average purchaser of insurance would consider DISH engaged primarily in the business of broadcasting," the fallacious nature of DISH's strained, statutory-based construction is clear.  *Arch Specialty*, 989 F. Supp. at 1148.

Like the term "broadcasting," the other excluded lines of business identified in the Media Exclusion—"advertising," "publishing," and "telecasting"—are similarly undefined and neither DISH, nor any witness on its behalf, was able to identify any technical or statutory definition referable to them.[56]  Undefined as they are, these terms also are required to be interpreted in accordance with their plain and commonly understood meanings.[57]  DISH's singling out of "business of broadcasting" for separate and distinct interpretive treatment based on an imported, but unreferenced, facially obscure definition buried deep within a nearly four hundred page statute, defies both reason and the basic rules of policy interpretation.  *See Buckley Bros. Motors, Inc. v. Gran Prix Imports, Inc.,* 633 P.2d 1081, 1083 (Colo. 1981) (In the absence of contrary manifestation of intent *in the contract itself*, contractual terms that have a general prevailing meaning will be interpreted according to that meaning.); *Robertson*, 994 P.2d 488 (strained

---

[56]  *See*, *e.g.*, Ex. P, Blum Dep. at 56:18–57:10 ("[T]elecasting doesn't have the discrete meaning that broadcasting has.  . . . I'm not aware of specific provisions on telecast [in any statutory scheme with which he was familiar.]").

[57]  *See*, *e.g.*, *Fed. Ins. Co. v. Tokio Marine & Fire Ins. Co.*, 572 N.Y.S.2d 306 (1st Dept. 1991) (ruling in relevant part, "there is no ambiguous language in the policy endorsement" [excluding coverage for defamation claims "in the course of or related to advertising, broadcasting, or telecasting activities"], as applied to an advertising agency engaged in the production of television commercials).

constructions should be avoided in favor of common constructions; technical and legal definitions should also be avoided).[58]

DISH's position also is contrary to the empirical fact that where the ACE Policy intends to incorporate a specific statutory definition by reference, it does so explicitly.  For example, the ACE Policy's "Nuclear Energy" exclusion defines "'[s]ource material', 'special nuclear material', and 'by-product material'" by direct reference to the "Atomic Energy Act of 1954 or [] any law amendatory thereof."[59]  "When the drafters so clearly knew how to express one [thing], their failure to do so implies that [it] was not intended.  Here, that argument is particularly compelling because . . . the drafters . . . could have used the method of expression employed in . . . preceding . . . paragraphs."  *Weight Loss Healthcare Ctrs. of Am., Inc. v. Office of Pers. Mgmt.* 655 F.3d 1202, 1210 (10th Cir. 2011).  The ACE Policy contains multiple explicit references to statutes, laws and regulations, demonstrating that the policy drafters know how to incorporate statutory references within the Policy.[60]  Had the drafters of the Policy intended that the Federal Communications Act definition of "Broadcaster" be incorporated into the Media Exclusion, it is objectively evident from the language of the Policy itself, that the drafters knew how to accomplish this but did not do so.

---

[58]   This obviously would include DISH's hyper-technical definition offered by its Rule 30(b)(6) witness, Jeffrey Blum, that in addition to requiring the free transmission of content over the airwaves to the public at large, "what makes a broadcaster a broadcaster in the United States is they are using spectrum at 600 megahertz, they are licensed by the FCC as a broadcaster, and they have certain rights, which we've discussed, and obligations."  Ex. P, Blum Dep. at 111:11–16; 112:25–113:4.  *See also*, *id.* at 24:4–14, 29:13–16 ("When I [use] the term broadcasting, the business of broadcasting, broadcaster, the whole set of regulatory laws and regulations, that's what I mean by that.").

[59]   Ex. 14 at 13, Exclusion s.(4)(c).  *See also*, *id.* at 70, Endorsement 21 (defining "Certified act of terrorism" to mean "an act that is certified . . . to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act" and explicitly incorporating the criteria contained in that Act).

[60]   *See*, *e.g.*, Ex. 14 at 8 (Coverage B. Exclusion "q. Recording And Distribution Of Material Or Information In Violation of Law"); Endorsement 21, and Coverage A. Exclusion u. (note 59 supra).

5.      **"An Insured Whose Business Is . . . Telecasting."**

In addition to being a broadcaster, DISH's business equally and clearly is that of a telecaster, thus providing further support that the Media Exclusion applies. Conceding that Title 47 U.S.C § 153(o), the 1934 Federal Communications Act's statutory definition of "Broadcasting" makes no mention of "telecasting," DISH is forcibly relegated to the term's commonly understood meaning: "to broadcast by television." *Arrowood*, 772 F.3d at 871. DISH witnesses professed little or no understanding of the term's meaning—in Mr. Blum's case allowing simply that he viewed "telecasting" as being synonymous with broadcasting in the general sense, Blum Dep. at 57:11–14. As the *Arch Specialty* Court held, the terms are not the same: "equating the two terms to this extent . . . would nullify the inclusion of 'telecasting' as an additional term," thereby violating the "basic rule of contract construction that each term in the policy should be read to have an independent meaning." *Arch Specialty*, 989 F. Supp. 2d at 1151; *Progressive Specialty Ins. Co. v. Hartford Underwriters Ins. Co.*, 48 P.3d 470, 474 (Colo. App. 2006) ("We also read the provisions of the policy as a whole and construe it so that all provisions are harmonious and none is rendered meaningless.").

The Tenth Circuit's rejection of DISH's attempted eradication of "telecasting" from its insurance contract, effectively encapsulates the point:

> DISH bases its arguments upon the rule of Colorado law that courts "must avoid reading an insurance policy so as to render some provisions superfluous." *Gen. Sec. Indem. Co. of Ariz. v. Mountain States Mut. Cas. Co.*, 205 P.3d 529, 537 (Colo. App. 2009). DISH, however, would have us apply the rule so as to prevent any overlapping terms whatsoever in an insurance policy. Because we are not convinced that this was the intent of the Colorado courts in adopting the rule, we decline to adopt DISH's position. Moreover, even assuming the terms "broadcasting" and "telecasting" have overlapping meanings, that does not render the [Media] exclusion provisions of the policies superfluous. Rather, as the district court aptly noted, the record suggests that the Insurers, by using both of the terms at issue, were simply attempting to "make clear that businesses involving the transmission of television programming to viewers [we]re excluded from advertising injury coverage." . . . We therefore conclude the district court did not

err in determining that DISH was engaged "primarily" in both "broadcasting" and "telecasting," given that these two terms have overlapping meanings.

*Arrowood*, 772 F.3d at 873.[61]

6. **DISH's Other Arguments Are Similarly Misplaced and Have Been Rejected by Colorado Courts.**

    a) **Reliance on Dictionary Definitions Debunked**

DISH is expected to argue that the "fee-based" service it provides should not be considered "broadcasting" because it is a subscription service not available to the public generally.  As observed in *Arch Specialty*, DISH asserts this position by "cherry-picking" dictionary definitions of "broadcast that include a public component."  *Arch Specialty*, 989 F. Supp. 2d at 1147.[62]  The *Arch Specialty* Court rejected that argument based on the Tenth Circuit's observation in *Pompa v. American Family Mutual Insurance Co.*, 520 F.3d 1139, 1149 (10th Cir. 2008), quoting the Wisconsin Supreme Court in *Sprangers v. Greatway Insurance Co.*, 182 Wis. 2d 521, 537, 514 N.W.2d 1 (1994), that:

> The mere fact that a word has more than one dictionary meaning, or that the parties disagree about the meaning, does not necessarily make a word ambiguous if the court concludes that only one meaning applies in the context and comports with the parties' objectively reasonable expectations . . . .  Thus it is inappropriate to create ambiguity by simply finding two different dictionary definitions . . . .  Dictionary definitions can shed only partial light

---

[61] Notably, the only statutory definition of "telecast" ACE has identified, is found in the "Television Program Improvement Act of 1990" and explicitly includes satellite television providers such as DISH. *See* 47 U.S.C. § 303c (defining the term "person in the television industry" to mean: ". . . any entity which produces programming . . . for telecasting *or telecasts programming* . . .", providing further that "the term 'telecast' means-- . . . to transmit . . . by a satellite television distribution service."). (Emphasis added).  Were DISH's statutory definition argument to be accepted, this definition, which predates the 2011 ACE Policy by twenty years, resolves in ACE's favor any question regarding DISH's status as a telecaster.

[62] *Contra Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*, No. 12-03098, 2014 WL 1217668 (C.D. Ill. Mar. 24, 2014) (wrongly concluding [both here and] under Illinois law that because the Travelers Policy at issue did not define the terms broadcasting and telecasting that it must turn to extrinsic evidence to determine meaning; and compounding this error by concluding that because there were two possible dictionary definitions—including DISH's proffered definition from Webster's less than ubiquitous New World *Telecom* Dictionary—that the terms were ambiguous and must be construed against the insurer).  Notably, *Travelers* was decided before *Arrowood*.

on the reasonable understanding of an insured with regard to words in the context of a particular insurance policy.

*Arch Specialty*, 999 F. Supp. 2d at 1149.  Noting that "insurers equally submit many dictionary definitions that do not include the [public consumption] component," the *Arch Specialty* Court pointedly gave DISH's proffered definitions no weight.  *Id.*; *see also*, *Arrowood*, 772 F.3d at 871–72 (rejecting DISH's dictionary-based argument, noting that "nothing in any of these common definitions . . . excludes fee-for-service transmissions," concluding that "the commonly-understood definitions of the terms 'broadcasting' and 'telecasting' undoubtedly encompass DISH's transmissions.").

> **b)** **DISH's "Classification Code" Arguments Have Also Been Rejected**

ACE also anticipates DISH will attempt the same flawed industry classification code arguments it previously and unsuccessfully tried in other cases.  In *Arrowood*, DISH argued illusively that standard industrial classification ("SIC") codes used by governmental agencies to track industry data, provided some insight into the "commonly understood definition" of the term "broadcasting."  772 F.3d at 870.  Unpersuaded, the Court concluded roundly that there was no evidence that "the classifications found within the SIC system are so well known or commonly employed that they can serve to define a term in a commercial general liability policy."  *Id.*  Leaving no doubt that SIC codes are irrelevant for purposes of assessing the intended meaning of a particular policy term, the Tenth Circuit held:

> [W]e reject DISH's assertion that the commonly understood definition of the term "broadcasting" can be gleaned from the SIC system.  The SIC system was established . . . as a "structure for the collection, presentation and analysis of the U.S. economy" (citation omitted), and it utilizes industry classifications of varying breadth.  DISH presents no evidence or case law that would allow us to conclude that the classifications found within the SIC system are so well known or commonly employed that they can serve to define a term in a commercial general liability policy.

*Id.* at 870.[63]

---

[63]   In *DISH I*, DISH similarly argued that the various (and variable) SIC code and/or general liability classification codes ("GLC codes") found on the declarations pages of ACE's polices signified ACE's then understanding that DISH's business was that of a "Radio and Television Broadcasting

DISH now re-attempts the same discredited approach, arguing that the presence of SIC codes on certain previous policies issued to DISH, confirms the ACE underwriters' understanding that DISH was not in the business of broadcasting.  Putting aside that it is not underwriters' alleged pre-claim understanding of DISH's business, but rather what DISH actually does that is the deciding factor for purposes of determining the Media Exclusion's application, the rest of what DISH argues is irrelevant and wrong.  It is irrelevant because "the initial question for the court on a motion for summary judgment is whether the contract is unambiguous with respect to the question disputed by the parties . . . [which is] a question of law for the court." *Clarke v. Travco Ins. Co.*, No. 13-CV-5140 (NSR), 2015 WL 4739978, at *7 (S.D. N.Y. Aug. 7, 2015). Absent a finding of ambiguity, extrinsic evidence regarding the parties' understanding or intent is irrelevant. *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.3d 1310, 1314 (Colo. 1984) (extrinsic evidence of intent should only be considered if the terms of the agreement are ambiguous).  It is wrong because as ACE's underwriters testified, and as the *Arrowood* Court found , SIC and GLC codes are utilized for the statistical "tracking of industry data and losses," and otherwise are  "not relevant to the coverages" afforded under a policy of insurance, much less determining the plain meaning of its terms.[64]

---

Communications Equipment Manufacturer" given the use of an SIC Code to that effect.  Similar arguments were made regarding the other—and shifting—descriptions of DISH's business found on policies' declarations page from time-to-time, "Communication" (2009-2011), "Cable and Other Pay Television Services" (2004-2006), and "Paid Television Provider" (2007-2008) as further evidencing ACE's understanding that DISH was not in either the "broadcasting" or "telecasting" business.  These and other argument of like effect did not prevent the Court's ruling that "the broadcasting and telecasting exclusion in Coverage B excludes DISH from coverage[.]" *DISH I*, 173 F. Supp. 3d at 1138 (quoting *Arrowood*, 772 F.3d at 872).

[64]  Sutton Decl. at ¶ 9, Ex. H, Monroe Dep. at 90:8–12, 141:7–12.  Erwin Montoya, ACE's senior underwriter for the 2011 ACE Policy, illustrated the utility of class codes as a means of aggregating data with the following example:  "[s]o if you wanted to know what the expected losses are for a hardware store in Missouri, you would enter the class code in the system . . . and it would give you the expected losses at a particular limit."  Ex. I, Montoya Dep. at 45:11–15.  Beyond this, they are of minimal use.

**c)      Subscription v. Non-Subscription:  DISH's "Pay" Versus "Free" Argument Fails**

Seeking to further distinguish itself from the broadcast licensees whose content it broadcasts to millions of viewers nationwide, DISH argues that because it charges its subscribers a fee, it is not a "broadcaster" within the narrow definition of the Federal Communications Act and is therefore immune from the Media Exclusion's preclusive effect.  What DISH ignores, of course, is the previously noted (and central) reason why a Media-type Exclusion is included in the policy in the first place:  "to limit [an] insurer's exposure to mass media-type injuries"—the very claims publishers, advertisers, broadcasters, and telecasters can reasonably be expected to face. Noting that it is the number of people that have access to the media that matters when it comes to insurance of this type, "not whether they pay for it," the *Arch Specialty* Court had little difficulty rejecting this argument.  *See* 989 F. Supp. 2d at 1148 ("[b]oth PBS and DISH are mass media businesses, and whether it is PBS broadcasting a slanderous statement or DISH . . . each entity presents a risky enterprise for purposes of advertising coverage.").  This Court should do the same.[65]

**d)      The Parties' Reasonable Expectations Do Not Support Coverage In This Case**

**(i)      Lockton's Explicit Warnings Preclude any Assertion by DISH that it Reasonably Expected a Defense of the Network Lawsuits**

Discovery has effectively demonstrated that DISH could not have reasonably expected a defense of the Network Lawsuits.  As previously discussed, the mere fact DISH and ACE disagree about the meaning of "broadcasting" and "telecasting" as used in the ACE Policy, does not make these words ambiguous "if the court concludes that only one meaning applies in the context and comports with the parties' objectively reasonable expectations."  *Pompa*, 520, F.3d at 1143.

---

[65]   That DISH's argument is a distinction without a difference is further underscored by noting that courts routinely use the term "broadcaster" to refer to for-pay television.  *See*, *e.g.*, *Huckabee v. Time Warner Ent.*, 19 S.W.3d 413, 426 (Tex. 1999) (describing HBO as a "broadcaster"); *Orth-O-Vision, Inc. v. Home Box Office, Time, Inc.*, 474 F. Supp. 672, 682 (S.D. N.Y. 1979) (concluding that HBO is a "broadcaster" because their broadcasts are capable of reaching any member of the general public willing to pay a fee and are intended to appeal to a mass audience).

Asking itself rhetorically "[h]ow DISH [could] assert it had a 'legitimate' expectation of a defense" when it was "explicitly warned that it would not be covered for many injuries because of the Broadcasting Exclusion," the *Arch Specialty* Court found DISH could not, holding that "[t]he evidence shows that DISH was informed unequivocally that the Insurers believed the [Media] Exclusion applicable." *Arch Specialty*, 989 F. Supp.2d at 1150.  This evidence, which discovery has since enlarged, includes the following:

- Beginning as early as May 3, 2001, Lockton advised DISH of the existence of "Broadcasters Errors & Omissions Coverage . . . available to cover your liability as a broadcasting professionals [sic].  This would allow for any unintentional errors you made in advertising or programming you produced or broadcasted as a professional broadcaster."[66]

- From July 2001 onward, Lockton identified to EchoStar and DISH, "**MAJOR EXCLUSIONS**" in their general liability coverage, including the Media Exclusion, and their effects, as an "**ITEM TO DISCUSS**."[67] *This same advice was repeated on a yearly basis, at least, in each of the proposals Lockton submitted to DISH.*[68]

- Lockton's 2006 "Insurance Proposal" identified the fact that DISH did not purchase "Broadcasters Errors & Omissions" coverage.  The 2006 proposal includes a handwritten asterisk and Elizabeth Booth's notation "Chelley recommends."[69]  Lockton continued to recommend that DISH obtain this coverage throughout at least 2015.

- Since at least 2008, DISH has been aware that its carriers would deny claims on the grounds that DISH was a broadcaster or a telecaster.  *See, e.g.,* Arrowood Indemnity Company's May 5, 2008 letter to DISH counsel, advising of Arrowood's denial of coverage for the *Katz* lawsuit, based on Arrowood's "understand[ing] that EchoStar's primary business operation is the broadcasting and/or telecasting of television programming via satellite," stating "[e]ven if the Complaint . . . alleged 'advertising injury' . . . coverage is precluded by the above business of 'advertising, broadcasting, publishing or telecasting' exclusion."[70]

---

[66]  SOF at ¶¶ 10, 40, Ex. 49, at 5.

[67]  SOF at ¶¶ 8-9, 13-14, and 40; Ex. 68 at 4–5.

[68]  SOF at ¶¶ 8-9, 13-14, and 40.

[69]  Ex. 48.  Michelle Schaper, the "Chelley" referred to in Ms. Booth's notation, at the time was Lockton's lead broker on the DISH/EchoStar account, and confirmed that as a starred item, her recommendation concerning the purchase of Broadcasters Errors and Omissions coverage "would have been something that was actually discussed at the meeting."  The reason she brought it up was "[b]ecause there are things that are excluded on a general liability policy for which they're liable and they [DISH] would not have coverage for them and this would fill that gap."  Ex. E, Schaper Dep. at 73:8–74:14.  Had DISH agreed to obtaining such coverage, its procurement would have required a separate application and would have been the subject of separate underwriting.  Ex. 48 at 34; Ex. 51 at 28.

[70]  SOF at ¶ 41, Ex. 134.

- On February 11, 2015, Elizabeth Booth who by then had succeeded Ms. Schaper as Lockton's lead account executive for DISH, responded to an email from Jennifer Palasz, DISH's risk manager, in which Ms. Palasz had asked Ms. Booth to provide her "five top recommendations" of "not purchased policies" that DISH consider "[g]iven your familiarity with DISH's business/risks and industry standards."   Ms. Booth responded with a list of that included "Broadcasters E&O."[71]

      **(ii)**    **Endorsement 19's Exclusion of "Broadcasting Services" from the Insurance Afforded Under the ACE Policy Further Eliminates Any Expectation of Coverage by DISH**

Even without Lockton's warnings, the ACE Policy's inclusion of Endorsement 19 and its exclusion from coverage of claims "due to the rendering of or failure to render [Broadcasting Services]" makes objectively unreasonable any expectation of coverage argument DISH may assert.[72]   Unlike the Media Exclusion, the "Designated Professional Services" exclusion has no "whose business is broadcasting" gloss and excludes from coverage any "personal and advertising injury" arising out of DISH's "Broadcasting Services," an undefined term understood by DISH to

---

[71]   SOF at ¶ 40, Ex. 62.  As with most, if not all of the other coverages Lockton recommended DISH purchase, including "Broadcasters E&O", DISH exercised its business judgment not to purchase any of them.  *See, e.g.*, Ex. E, Schaper Dep. at 88–90, 97–98 (confirming DISH business decision not to purchase "EPL" (employment practices liability) coverage, "satellite" and/or "business interruption" coverage, "UM/UIM" (uninsured/under insured motorist) coverage, and "intellectual property" and/or "patent infringement" coverage, and was equally chary regarding the dollar amounts of insurance purchased relative to "comparable companies from a revenue standpoint."):  "They were very conservative in their insurance purchasing," is how Ms. Schaper put it.  *Id.* at 98:9–10.  This was Elizabeth Booth's view as well:

> DISH, because of their financial balance sheet, they have chosen to self-insure a number of different types of coverages.  And broadcasters E&O/media liability happens to be one of those.  Over the course of the years, Lockton has pointed out to DISH multiple different kinds of insurance policies that are available in the marketplace for all of our clients that DISH did not currently, to Lockton's knowledge, purchase. . . . They made a business decision to purchase certain coverage and they made a business decision not to purchase certain coverages.

Ex. G, Booth Dep. at 77:11–78:2.

[72]   Ex. 14 at 68.  The relevant language of the exclusion is as follows:

> With respect to any professional services shown in the Schedule [Broadcasting Services], the following exclusion is added to . . . Paragraph 2., Exclusions of Section I–Coverage B–Personal And Advertising Injury Liability:

> This insurance does not apply to . . . "personal and advertising injury" due to the rendering of or failure to render any professional service.

mean transmission services, not some more abstruse construction.  As Mr. Blum testified when responding to a question about EchoStar's providing of "broadcast services" to DISH:

> Q.  And in this sentence, EchoStar provides certain broadcast services, how is the term, "broadcast" being used in this sentence?
>
> A.  Consistent with what I've described previously, as synonymous with transmission and distribution.[73]

His description of "broadcast services" as including transmission services provided to content suppliers, is of similar vein:

> Q.  And it says in the second sentence, "We provide certain broadcast services and sell hardware such as digital set-top boxes . . . to DISH Mexico" . . . .  What broadcast services are being referred to?
>
> A.  So in Mexico, there is a pay-TV service where *we have deals with programmers* to sell subscription service in Mexico.  So here, it's the general sense; the uplinking, the downlinking of satellite signals to subscribers in Mexico.[74]

That DISH provides professional broadcasting/transmission services, so defined, to millions of subscribers who receive those broadcasts, as well as to the television networks and other content providers with whom DISH contracts for broadcasting/distribution rights, is beyond question.  Indeed, it is precisely the furnishing of these services that is the beating heart of what DISH does.  As Mr. Blum described it:

> [T]he way that it works is we take the broadcast signal, [ ] these terrestrial, over-the-air signals, *via contract*, and we send them to our uplink center in Cheyenne, Wyoming.  And we turn that broadcast signal into a satellite signal . . . , and then send that signal . . . to our satellite.  That then comes back down to subscribers that have a set-top box in their home . . . and they watch their channels.[75]

---

[73]  Ex. P, Blum Dep. at 101:17–22.  *See also*, *id.* at 83:4–6 ("We broadcast programming to subscribers, which I define as synonymous with transmitting, distributing.").

[74]  *Id*. at 89:10–25 (emphasis added).

[75]  *Id*. at 23:5–16 (emphasis added).  *See also*, Dkt. 120-1 (DISH's Declaratory Judgment Complaint in *DISH Network L.L.C v. Am. Broad. Cos., Inc. et al.*, 12 CV 4155 (S.D. N.Y, May 24, 2012)) at ¶ 3 ("DISH is a party to contracts with each of the Major Television Networks that authorize DISH to re-*broadcast* the signals for the content shown on those networks.  DISH is required to pay the Major Television Networks hundreds of millions of dollars per year in re-transmission fees, collected from its subscriber base, for the right to re-*broadcast* those signals . . . .") (emphasis added).

No genuine issue exists that in using its DBS system to transmit the television networks' programming to DISH's customers, DISH provides broadcasting services both to its subscribers *and to the television networks* alike and employs a cadre of broadcast engineering professionals in support of those efforts.[76]   Nor is there any question that the liabilities and damages alleged in the Network Lawsuits were based on the manner those broadcasting services were advertised and/or provided via the Hopper.[77]   Given the Endorsement's wording and DISH's acknowledged understanding of the term "broadcasting services" as referring to its transmission-related services, the relevance and preclusive effect of the Endorsement is clear, making the question posed by the Court in *Arch Specialty* "[h]ow D[ISH] [could] assert it had a 'legitimate' expectation of a defense" particularly apt.[78]

---

[76]   *See* SOF at ¶ 34, Ex. 24 (announcing the appointment of Executive Vice President of Engineering and Broadcast, Jeff McSchooler, who DISH describes as "lead[ing] a team . . . responsible for broadcasting over 7,000 satellite television channels.").  *See also*, Ex. I, Montoya Dep. at 25:4–9 (responding to a question of what his understanding was of "the broadcasting services provided by DISH to its clients . . . .  My understanding was the use of their satellite to transmit the content to its subscribers.").

[77]   *See, e.g.*, Dkt. 120-11 (Plaintiffs' Complaint For Copyright Infringement in *NBC Studios LLC et al. v. DISH Network Corp., et al.*, CV12-04536 (C.D. Cal. May 24, 2012) at ¶ 3 ("Plaintiffs bring this action for preliminary and permanent injunctive relief against Defendants' unlawful scheme to profit from an unprecedented and unauthorized new system for violating Plaintiffs' copyrights in prime-time, network television programming.  *Defendants market this infringing system in connection with their satellite broadcast* **services** *and digital video recorder . . . called 'the Hopper.'* ") (Emphasis added).

[78]   *Arch Specialty*, 989 F. Supp. 2d at 1150.  Anticipating another argument DISH may raise, that because the Networks are not paying DISH for the broadcasting services rendered to them, Endorsement 19 could not reasonably be expected to apply to limit coverage, Patricia Koscondy, ACE's Vice-President for Errors & Omissions Underwriting and Media Product Manager, generally explained:

> The [E&O] policy covers acts, errors and omissions in the performance of professional services and the insured may affect a universe of parties *outside of their specific customers* and *any of those parties who might be affected by those services could potentially bring a claim*.

Ex. R, Koscondy Dep. at 30:15–21 (emphasis added).  In short it's the nature of the services, not who pays for them, that matters.

**CONCLUSION**

Through its structure and wording the ACE Policy accomplishes several things.  First, it provides through Coverage A, coverage for bodily injury and property damage liability claims arising out of DISH's installation and customer service operations, the bulk of DISH's general liability exposure.  Second, through Coverage B, the Policy provides a limited amount of coverage for "personal and advertising injury liability" claims, including a narrow and carefully circumscribed measure of copyright infringement protection.  It achieves this through a tightly scripted series of interlocking exclusions and definitions which contemplate coverage for a limited subset of personal injury claims ("false arrest", "malicious prosecution", and "wrongful eviction") (Exclusion j/Definition 13), and, for insureds *not* engaged in any of the four enumerated businesses of "advertising", "broadcasting", "publishing" or "telecasting", coverage for claims of "infringement, in your advertisement, of copyright, trade dress or slogan."  (Exclusion i).  For insureds *like DISH*, who *are* engaged in the business of broadcasting and/or telecasting, Exclusion j's prohibition against advertising-related copyright infringement claims is absolute, and, for avoidance of doubt, is made even more so by Endorsement 19's exclusion from coverage of any "'bodily injury', 'property damage' or 'personal and advertising injury' due to the rendering of or failure to render [Broadcasting Services]."

DISH's argument that the Media Exclusion's elimination of copyright infringement claims is inapplicable because DISH is not regulated as a "broadcast licensee" under the Federal Communications Act and therefore is not "in the business of broadcasting" in any commonly understood sense—not to mention its ignoring of "telecasting" entirely—flips the ACE Policy's carefully conceived structure on its head.  Under DISH's reading, not only are DISH's operationally-related "high frequency/low severity" bodily injury and property damage claims covered under Coverage A, but also the entire universe of DISH's "low frequency/high severity" advertising and copyright exposures, the very "enhanced risks" insureds operating in the media-related marketplace are more likely to face, and for which separate, specifically tailored "media

liability policies" are required.[79]  It is for this precise reason that the ACE Policy's "Excess General Liability" form is written the way that it is, and why Lockton repeatedly recommended to DISH that it purchase separate broadcasters errors and omissions coverage to cover this heightened aspect of its risk profile.

No genuine issue exists that Lockton's recommendations were communicated to DISH on a yearly, if not a more frequent basis, or that DISH never challenged the central premise on which the advice was given.  As Michelle Schaper, Lockton's senior broker on DISH's account testified:

> A.  I presented a broadcasting exclusion and option for E&O for 14 years, some of which [to] the number 14 employee . . . who is the treasurer for DISH Network, and never once did they correct my terminology, tell me they weren't a broadcaster, tell me that they're a subscription provider ever . . .

> *   *   *

> Q.  Were they obliged to tell you the reason why they didn't want to buy the insurance?

> A.  No, but they would tell me that they just don't believe in buying it.  They never said, why would we buy it.  Chelley, this is a ridiculous thing.  Why would we buy broadcasters E&O.  We're not a broadcaster.  You clearly don't understand our business.  I mean, if we were really that far off they probably would have fired us.[80]

No material issue exists that DISH never fired Lockton or, more importantly, that DISH's decision not to purchase this additional coverage, and numerous other coverages recommended by Lockton to fill in other gaps in DISH's insurance program, was nothing less than a clear and purposeful exercise of business judgment on its part.  Like other exercises of free will, the consequences of DISH's "very conservative . . . insurance purchasing decisions" are for DISH and DISH alone to bear, not ACE.  Because no genuine triable issue exists that "the business in which DISH is engaged [falls] squarely within the meaning of 'broadcasting,'" as the *Arch Specialty*,

---

[79]  *See*, *e.g.*, *Arch Specialty*, 989 F. Supp. at 1148 n.11 ("insureds in [the advertising, broadcasting, publishing or telecasting] line of business should procure media, broadcasters or publishers liability policy to cover their enhanced risk in the media-related market place.") (quoting Baldwin, "Commercial General Liability Coverages, An Overview", 707 PLI/Lit 83, 188 (2004)).

[80]  Ex. E, Schaper Dep. at 152:22–153:13.

*Arrowood*, and *DISH I* Courts unequivocally found, the Media Exclusion unambiguously applies to bar the coverage DISH seeks.  Backstopping this outcome, Endorsement 19's "Broadcasting Services" exclusion dictates the same result.

As ACE said at the outset, this is not a difficult case.

ACE's motion for summary judgment dismissing DISH's Complaint should be granted in all respects.

Dated: March 18, 2019     Respectfully submitted,

            COZEN O'CONNOR
            Attorneys for Defendant, ACE American Insurance
            Company

      By:   */s/ Terri A. Sutton*
            Adam Stein
            COZEN O'CONNOR
            45 Broadway, 16th Floor
            New York, New York 10006
            Email:  adamstein@cozen.com
            Telephone:  212-453-3728

            Thomas M. Jones
            Email:  tjones@cozen.com
            Terri A. Sutton
            Email:  tsutton@cozen.com
            COZEN O'CONNOR
            999 Third Avenue, Suite 1900
            Seattle, Washington 98104
            Telephone:  206-340-1000
            Fax:  206-621-8783
            *admitted pro-hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2019, I electronically filed and served the foregoing

with the Clerk of Court using CM/ECF system to the following:

Lee M. Epstein
Matthew Goldstein
Weisbrod Matteis & Copley PLLC
Two Logan Square, Suite 1925
100 N. 18th Street
Philadelphia, PA 19103
Telephone:  267-281-7595
lepstein@wmclaw.com
mgoldstein@wmclaw.com

*Counsel for Dish Network LLC*

*/s/  Terri A. Sutton*
Terri A. Sutton

39836093\1