**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DISH NETWORK CORPORATION and | : | |
| DISH NETWORK L.L.C. | : | |
| Plaintiffs, | : | Case No. 1:16-cv-04011-ALC |
| v. | : | |
| | : | |
| ACE AMERICAN INSURANCE COMPANY | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

**MEMORANDUM OF LAW OF PLAINTIFFS**
**DISH NETWORK CORPORATION AND DISH NETWORK L.L.C.**
**IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

Lee M. Epstein
Matthew A. Goldstein (admitted *pro hac vice*)
Weisbrod Matteis & Copley PLLC
Two Logan Square, Suite 1925
100 N. 18th Street
Philadelphia, PA 19103
(215) 883-7422
lepstein@wmclaw.com
mgoldstein@wmclaw.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................3

ARGUMENT ...........................................................................................................................5

I.   The Underlying Allegations Fall Within ACE's Promise to Defend DISH and Outside of
     Exclusion j .....................................................................................................................6

     A.   The Allegations in the Underlying Broadcaster Lawsuits Expressly Distinguish Between
          the Broadcasting Business Engaged in by the Broadcasters and the Non-Broadcasting
          Business Engaged in by DISH ...............................................................................7

     B.   ACE's Interpretation of Exclusion j Is Neither Reasonable Nor the Only Reasonable
          Interpretation ...................................................................................................10

          1.   The Plain Language of the ACE Policies Establishes that DISH Is Not in the
               Broadcasting or Telecasting Business .........................................................11

          2.   Exclusion j Is at Least Ambiguous .............................................................14

               a.   The Businesses of Broadcasting and Telecasting Are Susceptible to Being
                    Defined in Multiple Reasonable Ways ..............................................15

               b.   As a Satellite Pay-TV DBS Provider DISH Is Not in the Broadcasting or
                    Telecasting Business as a Matter of Law............................................18

          3.   The Extrinsic Evidence Establishes the Parties' Mutual Understanding that DISH Is
               Not in the Broadcasting or Telecasting Business ..........................................22

               a.   DISH and ACE Shared a Mutual Understanding Concerning the Non-
                    Broadcasting Nature of DISH's Business............................................23

               b.   The DISH Annual Reports Relied on by ACE State Expressly That DISH
                    Provides Subscription Not Broadcasting Services................................23

               c.   The Class Codes that ACE Assigned to DISH Reflect ACE's Understanding
                    that DISH Is Not in the Broadcasting or Telecasting Business ..............24

               d.   The Hazards that ACE Associated with DISH Were Consistent with Equipment
                    Installation and Repair Engaged in by Subscription Service Providers .............26

               e.   ACE Previously Agreed to Defend the Interests of DISH Against Claims
                    Alleging "Personal and Advertising Injury"........................................27

II.  New York Law Governs This Action .................................................................................28

     A.   There Is No Actual Conflict Between the Laws of New York and Colorado ..................29

     B.   New York Law Should Be Applied in the Event the Court Concludes that There Is an
          Actual Conflict..................................................................................................31

CONCLUSION.........................................................................................................................35

# TABLE OF AUTHORITIES

## Federal Cases

*10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*,
  634 F.3d 112 (2d Cir. 2011) ........................................................................ 15

*ACE Am. Ins. Co. v. Dish Network, LLC*,
  173 F. Supp. 3d 1128 (D. Colo. 2016) .................................................. 20, 21

*Am. Emp'rs Ins. Co. v. Delorme Publ'g Co.*,
  39 F. Supp. 64 (D. Me. 1999) ........................................................................ 6

*Barnes v. Am. Int'l Life Assur. Co. of N.Y.*,
  681 F. Supp. 2d 513 (S.D.N.Y. 2010) ........................................................ 27

*Barney Greengrass, Inc. v. Lumbermens Mut. Cas. Co.*,
  445 F. App'x 411 (2d Cir. 2011) ........................................................ 7, 8, 21, 29

*Beazley Ins. Co., Inc. v. Ace Am. Am. Ins. Co.*,
  197 F. Supp. 3d 616 (S.D.N.Y. 2016) ........................................................ 14

*Beth Israel Med., Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*,
  448 F.3d 573 (2d Cir. 2006) ......................................................................28

*CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*,
  720 F.3d 71 (2d Cir. 2013) .......................................................................... 7

*City P'ship Co. v. IR-TCI Partners V, L.P.*,
  252 F. Supp. 2d 1114 (D. Colo. 2003) ...................................................... 30

*DIRECTV, Inc. v. F.C.C.*,
  110 F.3d 816, 821 (D.C. Cir. 1997) ............................................................ 4

*DISH Network Corp. v. Arch Specialty Ins. Co.*,
  989 F. Supp. 2d 1137 (D. Colo. 2013) ...................................................... 20

*DISH Network Corp. v. Arrowood Indem., Co.*,
  772 F.3d 856 (10th Cir. 2014) .................................................................... 21

*Dixhuit v. Pruco Life Ins. Co. of N.J.*,
  No. 14-cv-2165, 2014 WL 4230586 (S.D.N.Y. Aug. 27, 2014) .................... 31, 35

*Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*,
  754 F.3d 136 (2d Cir. 2014) ...................................................................... 29

*Frank v. Reassure Life Ins. Co.*,
  548 F. App'x 706 (2d Cir. 2013) ................................................................ 13

*Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*,
    314 F. Supp. 3d 534 (S.D.N.Y. 2018) ........................................................ 7, 8, 29

*Hastings Dev., LLC v. Evanston Ins. Co.*,
    701 F. App'x 40 (2d Cir. 2017) ........................................................................ 22

*Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*,
    252 F.3d 608 (2d Cir. 2001) ........................................................................... 19

*Jorgensen Forge Corp. v. Ill. Union Ins. Co.*,
    No. 13-cv-1458, 2015 WL 9595410 (W.D. Wash. Apr. 29, 2015) ..................... 6

*Lefrak Org., Inc. v. Chubb Custom Ins. Co.*,
    942 F. Supp. 949 (S.D.N.Y. 1996) ................................................................. 20

*Lexington Ins. Co. v. MGA Entm't, Inc.*,
    961 F. Supp. 2d 536 (S.D.N.Y. 2013) .............................................................. 6

*Liberty Mut. Ins. Co. v. Fairbanks Co.*,
    170 F. Supp. 3d 634 (S.D.N.Y. 2016) ............................................................ 35

*Licci v. Lebanese Canadian Bank, SAL*,
    672 F.3d 155 (2d Cir. 2012) ............................................................... 28, 29, 30

*Maclaren Europe Ltd. v. ACE Am. Ins. Co.*,
    908 F. Supp. 2d 417 (S.D.N.Y. 2012) ................................................. 31, 32, 35

*Nat'l Ass'n for Better Broad. v. FCC*,
    849 F.2d 665 (D.C. Cir. 1988) ....................................................................... 19

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*,
    734 F. App'x 586 (10th Cir. 2018) ................................................................. 30

*Old Republic Gen. Ins. Corp. v. Scottsdale Ins. Co.*,
    No. 15-cv-31, 2016 WL 1237349 (W.D. Pa. Mar. 30, 2016) .............................. 6

*Schwartz v. Liberty Mut. Ins. Co.*,
    539 F.3d 135 (2d Cir. 2008) ........................................................................... 31

*Scottsdale Ins. Co. v. United Indus. & Constr. Corp.*,
    137 F. Supp. 3d 167 (E.D.N.Y. 2015) .............................................................. 8

*Seife v. U.S. Dep't of State*,
    298 F. Supp. 3d 592 (S.D.N.Y. 2018) .............................................................. 5

*State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*,
    343 F.3d 249 (4th Cir. 2003) ........................................................................... 6

*Stone Key Partners, LLC v. Monster Worldwide, Inc.*,
    333 F. Supp. 3d 316 (S.D.N.Y. 2018) ............................................................ 27

*Sungchang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.*,
No. 12-cv-7280, 2013 WL 5366373 (S.D.N.Y. Sept. 25, 2013) ........................................... 28

*Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*,
971 F. Supp. 2d 368 (S.D.N.Y. 2013) ..................................................................... 28, 29, 30

*Town Plaza of Poughquag, LLC v. Hartford Ins. Co.*,
175 F. Supp. 3d 93 (S.D.N.Y. 2016) ............................................................................. 7

*Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*,
No. 12-cv-03098, 2014 WL 1217668 (C.D. Ill. Mar. 24, 2014) ............................... 17, 18, 20

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*,
594 F. App'x 700 (2d Cir. 2014) ............................................................................. 14

*Viesti Assocs., Inc. v. Pearson Educ., Inc.*,
No. 11-cv-01687, 2014 WL 1053772 (D. Colo. Mar. 19, 2014) ........................................ 30

*W. Int'l Syndication Corp. v. Gulf Ins. Co.*,
No. 04-cv-2349, 2004 WL 2580788 (C.D. Cal. Sept. 2, 2004) .......................................... 20

*WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.*,
549 F. Supp. 2d 555 (S.D.N.Y. 2008) ........................................................................... 8

*Zurich Am. Ins. Co. v. Wausau Bus. Ins. Co.*,
206 F. Supp. 3d 818 (S.D.N.Y. 2016) ................................................................... passim

## Federal Statutes and Rules

Fed. R. Civ. P. 56 .............................................................................................................. 5

17 U.S.C. § 501 ................................................................................................................. 9

47 U.S.C. § 153 .............................................................................................................. 9, 18

47 U.S.C. § 310 ................................................................................................................. 19

47 U.S.C. § 312 ................................................................................................................. 19

47 U.S.C. § 315 ................................................................................................................. 19

47 U.S.C. § 317 ................................................................................................................. 19

47 U.S.C. § 325 ................................................................................................................. 19

47 U.S.C. § 503 ................................................................................................................. 19

47 U.S.C. § 508 ................................................................................................................. 19

47 U.S.C. § 509 ................................................................................................................. 19

47 U.S.C. § 522 ................................................................................................................. 9

## **State Cases**

*Bailey v. Fish & Neave*,
  868 N.E.2d 956, 959 (N.Y. 2007) ........................................................................ 11

*City of New York. v. Phila. Indem. Ins. Co.*,
  54 A.D.3d 709, 710 (2d Dep't 2008) ................................................................... 11

*Cyprus Amax Minerals Co. v. Lexington Ins. Co.*,
  74 P.3d 294 (Colo. 2003) ..................................................................................... 29

*Hecla Mining Co. v. N.H. Ins. Co.*,
  811 P.2d 1083 (Colo. 1991) ........................................................................... 21, 29

*Hoang v. Assurance Co. of Am.*,
  149 P.3d 798 (Colo. 2007) ................................................................................... 30

## **State Statutes**

11 NYCRR § 16.3 ............................................................................................................ 32

N.Y. Ins. Law § 6301 ..................................................................................................... 32

N.Y. Ins. Law § 6303 ..................................................................................................... 33

## **Other**

*Subscription Video Report & Order*,
  2 FCC Rcd. 1001 (1987) ...................................................................................... 19

Restatement on Conflict of Laws § 193 ....................................................................... 31

Plaintiffs DISH Network Corporation and DISH Network L.L.C. (collectively, "DISH") submit this memorandum of law in support of their motion for partial summary judgment. By this motion, DISH seeks judgment with respect to Count One of its Amended Complaint. (ECF 12). Specifically, DISH seeks a judicial declaration that Defendant ACE American Insurance Company ("ACE") has a duty to defend or pay the costs of defending DISH in a series of underlying lawsuits involving the four major broadcast networks.

## PRELIMINARY STATEMENT

In denying DISH an insurer-provided defense, ACE relies on an exclusion that purports to bar coverage for insureds whose business is broadcasting or telecasting. ACE argues that DISH is in the broadcasting or telecasting business because it broadcasts television programming. ACE's simplistic and erroneous view of the broadcasting or telecasting business is belied by the underlying allegations against DISH, the terms of the insurance policies that ACE sold DISH, and the available extrinsic evidence. In all, the broadcasting or telecasting business has a well-known meaning that has never included DISH's satellite, pay-TV, multichannel video programming distributor ("MVPD") business.

In order to defeat DISH's motion and avoid its duty to defend, ACE must establish that the underlying allegations fall "solely and entirely" within its policy exclusion and that the exclusion is subject to "no other reasonable interpretation." ACE cannot meet its "heavy burden."

*First*, there is no underlying allegation even suggesting that DISH is in the business of broadcasting or telecasting. To the contrary, it is alleged that DISH is in the separate and distinct satellite, pay-TV business. The underlying plaintiffs—the four major broadcasting networks— expressly distinguish between the broadcasting business that they are engaged in and the separate

and distinct pay-TV business engaged in by DISH. ACE cannot avoid the import of those underlying allegations and, therefore, cannot satisfy its burden of establishing that the underlying allegations fall "solely and entirely" within the exclusion upon which it relies.

*Second*, ACE's insurance policies explicitly describe DISH's business. ACE never once (over a twelve year period) described DISH's business as broadcasting or telecasting. Instead, ACE expressly stated that DISH was in either the pay-television or the equipment manufacturing or installation business. Thus, the plain language of ACE's insurance policies establishes that DISH is not engaged in the excluded businesses of broadcasting or telecasting and disproves ACE's contention that the relied-upon exclusion is subject to "no other reasonable interpretation."

*Third*, the exclusion relied on by ACE is, at a minimum, ambiguous. Insurance policy language is ambiguous when it is susceptible to more than one reasonable interpretation. For that reason, even if the exclusion could be interpreted reasonably in the manner suggested by ACE, interpreting the exclusion as inapplicable to DISH's MVPD, pay-TV business remains reasonable and supported by dictionary definitions and the applicable statutes, regulations, and case law.

*Fourth*, if this Court considers extrinsic evidence for the purpose of resolving ACE's ambiguous policy language, that evidence (including ACE's defense of DISH against other similar claims) unequivocally supports the conclusion that DISH is not in the broadcasting or telecasting business. DISH has always presented itself to ACE and the public as a MVPD, pay-TV provider which, by definition, is not engaged in the broadcasting or telecasting business. ACE's underwriting documents likewise reflect ACE's understanding that DISH is a MVPD, pay-TV provider, and not engaged in the broadcasting or telecasting business.

For these reasons and those discussed more fully below, ACE cannot satisfy its burden of establishing that its exclusion for insureds engaged primarily in the broadcasting or telecasting business bars coverage and, accordingly, DISH is entitled to a defense and summary judgment as a matter of law.

## BACKGROUND[1]

ACE insured DISH under a series of commercial general liability ("CGL") insurance policies (collectively, the "ACE Policies"). SUMF ¶56. ACE promised under the ACE Policies to defend and indemnify DISH against claims of "Personal and Advertising Injury," including: "[i]nfringing upon another's copyright . . . in your 'advertisement.'" SUMF ¶¶58-62.

In a series of lawsuits, the four major broadcasting networks, ABC, NBC, CBS and Fox (collectively, the "Broadcasters") sued DISH for copyright infringement in DISH's advertisements (collectively, the "Broadcaster Lawsuits"). SUMF ¶¶44, 63-66. Specifically, the Broadcasters alleged that DISH, through its "Hopper" digital video recorder, infringed on the Broadcasters' exclusive reproduction rights in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.*, by making the Broadcasters' copyrighted programming available to DISH's customers without commercials. SUMF ¶¶64, 81. The Broadcasters alleged further that DISH, in its marketing and advertising, induced DISH customers to infringe the Broadcasters' copyrights in violation of the Copyright Act. SUMF ¶66.

ACE denied any duty to defend or indemnify DISH in connection with the Broadcaster Lawsuits. SUMF ¶¶47, 67. In denying coverage, ACE relies on Exclusion j, which purports to bar coverage for personal and advertising injury committed by an insured whose business is

---

[1] DISH's Statement of Undisputed Material Facts ("SUMF") is being contemporaneously filed with this motion, in accordance with Local Rule 56.1(a). DISH's SUMF is incorporated herein and all facts cited herein are to "SUMF ¶__" or a document attached as a Tab to the Declaration of Lee M. Epstein submitted in support of DISH's Motion for Partial Summary Judgment ("Epstein Dec.") and filed contemporaneously with this motion.

broadcasting or telecasting. SUMF ¶¶48, 68-70. ACE contends that DISH is in the business of broadcasting or telecasting simply because DISH broadcasts a signal. SUMF ¶¶49, 71-74. Notwithstanding that contention, ACE agrees that Exclusion j, by its express terms, applies only to insureds that are in the business of broadcasting, and not to insureds that merely broadcast television programming. SUMF ¶¶91-99.

Video programming is distributed by entities engaged in three distinct lines of business: (1) MVPDs; (2) broadcast television stations; and (3) online video distributors. SUMF ¶75. DISH is a direct broadcast satellite "("DBS")[2] MVPD. SUMF ¶77. As a DBS, MVPD, DISH is not in the business of broadcasting or telecasting. SUMF ¶¶106-55.

The allegations in the Broadcaster Lawsuits expressly distinguish between the various businesses that deliver video programming. SUMF ¶¶81-90. Specifically, the complaints in the Broadcaster Lawsuits distinguish between the Broadcasters who are alleged to be in the business of broadcasting and DISH who is alleged to be in the separate and distinct satellite, pay-TV DBS business. *Id.*

DISH's business is expressly described in the ACE Policies through: (1) the "Business of Insured" provision; and (2) reference to industry Class Codes. SUMF ¶¶156-76, 249-54. With every opportunity to do so, ACE never described DISH's business in the ACE Policies as broadcasting or telecasting. SUMF ¶¶156-76, 252-54, 259, 262. Instead, the "Business of Insured" provision of the ACE Policies describes DISH's business, depending on the year, as: "Cable and Other Pay Television Services"; "Paid Television Provider"; or "Communication" or "Communications." SUMF ¶¶160-64, 253. The ACE Policies further describe DISH's

---

[2] "DBS is a radio communication service that uses satellites in geostationary orbits to transmit multiple channels of video programming directly to 18–inch satellite dishes located at the premises of subscribers." *DIRECTV, Inc. v. F.C.C.*, 110 F.3d 816, 821 (D.C. Cir. 1997).

business through Class Codes as: "Radio and Television Broadcasting and Communications Equipment" and "Telecommunication Equipment Mfg." SUMF ¶¶166-76.

Finally, all of the available extrinsic evidence establishes that the parties shared a mutual understanding that DISH is not in the broadcasting or telecasting business. DISH consistently represented itself in public filings, and in documents provided to ACE, as a satellite pay-TV, DBS provider. SUMF ¶¶100-05, 186-97, 255-56. ACE relied on and incorporated DISH's representations into its underwriting of the ACE Policies. SUMF ¶¶186-97, 255-56. ACE never once, orally or in writing, stated that DISH was in the business of broadcasting or telecasting. SUMF ¶277. To the contrary, by ACE's own calculation, ACE determined that 92.52% of DISH's payroll was devoted to "Television or Radio Receiving Set Installation or Repair." SUMF ¶¶198-218.

## **ARGUMENT**

Summary judgment shall be granted upon the movant showing that there is no genuine dispute as to any material fact and its entitlement to judgment as a matter of law. Fed. R. Civ. P 56(a). "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under governing law.'" *Seife v. U.S. Dept. of State*, 298 F. Supp. 3d 592, 604 (S.D.N.Y. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When cross-motions for summary judgment are filed, "'the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law.'" *Zurich Am. Ins. Co. v. Wausau Business Ins. Co.*, 206 F. Supp. 3d 818, 823 (S.D.N.Y. 2016) (Carter, J.) (quotation omitted).

As applied in the context of an insurer's duty to defend, the summary judgment standard "is unique in that—rather than precluding summary judgment—'any factual dispute affecting the

existence of [insurance] coverage creates a potential for coverage and a duty to defend.'"
*Lexington Ins. Co. v. MGA Entm't, Inc.*, 961 F. Supp. 2d 536, 548 (S.D.N.Y. 2013) (quotation
omitted; alteration in original). *See also Old Republic Gen. Ins. Corp. v. Scottsdale Ins. Co.*, No.
15-cv-31, 2016 WL 1237349, at *2 (W.D. Pa. Mar. 30, 2016) ("[I]f there are any genuine
disputes of fact regarding coverage, the insured party is entitled to summary judgment on
the duty to defend.") (citation omitted); *Jorgensen Forge Corp. v. Ill. Union Ins. Co.*, No. 13-cv-
1458, 2015 WL 9595410, at *3 (W.D. Wash. Apr. 29, 2015) (same). Accordingly, ACE cannot
defeat this motion by pointing to a genuine dispute of material fact; ACE must establish the
absence of any genuine dispute of material fact.

## I.     The Underlying Allegations Fall Within ACE's Promise to Defend DISH and Outside of Exclusion j

ACE promised to pay the costs that DISH incurred defending against any claim for
"[i]nfringing upon another's copyright . . . in your 'advertisement.'" SUMF ¶¶60-61. The
Broadcasters allege explicitly that DISH infringed the Broadcasters' copyrights in DISH's
advertisements. SUMF ¶¶63-66. Those allegations fall squarely within the coverage of the
operative 2011 ACE Policy and ACE does not argue otherwise. Instead, ACE argues that
coverage is barred by Exclusion j.

As relevant here, Exclusion j purports to bar coverage for "[p]ersonal and advertising
injury committed by an insured whose business is . . . broadcasting . . . or telecasting." SUMF
¶¶48, 69. Such Exclusions apply only to insureds that are "primarily engaged" in one of the
identified businesses. *See State Auto Prop. & Cas. Ins. Co. v. Travelers Indem. Co. of Am.*, 343
F.3d 249, 261 (4th Cir. 2003) ("The phrasing 'insureds whose business is . . .' clearly
contemplates that the insured is more than just, in part, engaged in advertising.") (quotation and
internal quotation marks omitted; alteration in original); *Am. Emp'rs Ins. Co. v. Delorme Publ'g*

*Co.*, 39 F. Supp. 2d 64, 82 (D. Me. 1999) ("Hence, in this context, to be 'in the business' of one of the four listed areas plainly means to be more than merely engaged in part and clearly means to be at least primarily engaged in that activity.").

ACE cannot satisfy its "heavy burden" of establishing that the allegations asserted against DISH in the Broadcaster Lawsuits fall "solely and entirely" within Exclusion j and that there is "no other reasonable interpretation" of the Exclusion. *Barney Greengrass, Inc. v. Lumbermans Mut. Cas. Co.*, 445 F. App'x 411, 413 (2d Cir. 2011) (citation omitted).

**A.   The Allegations in the Underlying Broadcaster Lawsuits Expressly Distinguish Between the Broadcasting Business Engaged in by the Broadcasters and the Non-Broadcasting Business Engaged in by DISH**

An insurer's duty to defend "'arises whenever the allegations within the four corners of the underlying complaint *potentially* give rise to a covered claim.'" *Harleysville Worcester Ins. Co. v. Wesco Ins. Co., Inc.*, 314 F. Supp. 3d 534, 542 (S.D.N.Y. 2018) (quoting *Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co*., 690 N.E.2d 866, 868 (N.Y. 1997)) (emphasis in original). Accordingly, "[a]n insurer must defend a claim whenever the complaint suggests a reasonable possibility of coverage, regardless of the merits of the action." *Town Plaza of Poughquag, LLC, v. Hartford Ins. Co*., 175 F. Supp. 3d 93, 99 (S.D.N.Y. 2016) (Carter, J.) (citing *Fitzpatrick v. Am. Honda Motor Co., Inc.*, 575 N.E.2d 90, 91-92 (N.Y. 1991)); *CGS Indus., Inc. v. Charter Oak Fire Ins. Co.*, 720 F.3d 71, 81 (2d Cir. 2013) ("'If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to defend its insured no matter how groundless, false or baseless the suit may be.'") (quotation omitted); *Harleysville*, 314 F. Supp. 3d at 542 ("[E]ven if the complaints were *ambiguous* as to a fact material to coverage, the ambiguity must be resolved in favor of the insured.") (quotation omitted; emphasis omitted).

-7-

An insurer's burden is even greater when it relies on an exclusion to deny its duty to defend. "The insurer bears a ***heavy burden*** of demonstrating that the allegations of the complaint," which are liberally construed in favor of coverage, "cast the pleadings wholly within the exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no ***possible legal or factual basis*** upon which the insurer may eventually be required to indemnify the insured." *WTC Captive Ins. Co., Inc. v. Liberty Mut. Fire Ins. Co.*, 549 F. Supp. 2d 555, 562 (S.D.N.Y. 2008) (citing *Frontier*, 690 N.E.2d at 868-69) (emphasis added). *See also Scottsdale Ins. Co. v. United Indus. & Constr. Corp.*, 137 F. Supp. 3d 167, 175-76 (E.D.N.Y. 2015) (same). An insurer's "heavy burden" in successfully avoiding its duty to defend is "seldom met":

> New York courts have consistently held that...an insurer seeking to avoid its duty to defend bears a heavy burden. That burden, in practice, is seldom met. Indeed, before an insurance company is permitted to avoid policy coverage, it must ... establish that the exclusions or exemptions claimed apply in the particular case, and that they are subject to no other reasonable interpretation. To avoid the duty to defend, the insurer must show that the allegations in the underlying complaint are solely and entirely within the policy's exclusions from coverage. *A court applying New York law, then, should only excuse an insurer from its* duty *to* defend *if it can be concluded as a matter of law that there is no possible factual or legal basis on which the insurer might eventually be held to indemnify the insured.*

*Barney Greengrass*, 445 F. App'x at 413 (quotation omitted; emphasis and alterations in original).

Although ACE contends that DISH is in the excluded business of broadcasting or telecasting (SUMF ¶¶48-49, 70-74), the allegations in the Broadcaster Lawsuits clearly distinguish between the broadcasting business engaged in by the Broadcasters and the satellite subscription, pay-TV business engaged in by DISH. Specifically, the Broadcasters sued DISH under section 501 of the Copyright Act. SUMF ¶¶64-66. That section expressly distinguishes

between a "broadcast station," a "cable system," and a "satellite carrier." 17 U.S.C. § 501. The

term "broadcast station" along with "broadcasting station" and "radio broadcast station" is

defined as "a radio station equipped to engage in broadcasting as herein defined." 47 U.S.C. §

153(6). "Broadcasting," in turn, is defined as "the dissemination of radio communications

intended to be received by the public, directly or by the intermediary of relay stations." 47

U.S.C. §153(7) (emphasis added)). A satellite carrier, like DISH, is separately defined as a

"multichannel video programming distributor," which "means a person such as, but not limited

to, a cable operator, a multichannel multipoint distribution service, a direct broadcast satellite

[DBS] service, or a television receive-only satellite program distributor, who makes available for

purchase, by subscribers or customers, multiple channels of video programming. 47 U.S.C.

§522(13); SUMF ¶76.

      While the Broadcasters refer to themselves as the four "major national broadcast

networks," DISH is alleged to be the operator of "the third largest pay television transmission

system in the United States." SUMF ¶84. Under the heading **"Free Over-the-Air,**

**Commercially Supported Broadcasting,"** NBC directly drew a distinction between the

broadcasting business and a subscription-based business, like DISH's. SUMF ¶¶85, 88.

Similarly, Fox described the distinct "business mode" employed by those engaged in free

broadcast television under the heading, **"Commercial Advertising and the Broadcast**

**Television Model."** SUMF ¶86.

      In addition to distributing television programming through "free broadcast television,"

the Broadcasters expressly alleged that various other separate and distinct businesses, including

satellite television providers, distribute their programming. Fox, for example, alleged that, "a

separate and growing market exists for services that permit cable and satellite television

subscribers to select from a library of previously-aired television programs for immediate viewing on television." SUMF ¶87. Both ABC and NBC further delineated the distinction between free "over-the-air" network television and other businesses for distributing television programming. SUMF ¶¶88-90. Indeed, the complaints in the Broadcaster Lawsuits discuss in great detail the separate and distinct businesses through which television programming is distributed, including: (1) local broadcasting stations; (2) on-demand access on cable or satellite services; (3) internet-based services such as iTunes, Hulu, and Netflix; (4) mobile phone services; (5) pay-per-view and location-based (*e.g.*, airline and hotel) services; and (6) portable media (*e.g.*, DVDs and Blu-Ray Discs). SUMF ¶90.

In all, as alleged in the Broadcaster Lawsuits, those in the broadcasting business are suing DISH - - one of the many separate and distinct non-broadcasting businesses that distribute television programming. Because there is no allegation in the Broadcaster Lawsuits that DISH is in the business of broadcasting or telecasting, ACE cannot satisfy its burden establishing that the underlying allegations fall "solely and entirely" within Exclusion j. For this reason alone, ACE should be ordered to undertake its duty to defend DISH in the Broadcaster Lawsuits.

### B.    ACE's Interpretation of Exclusion j Is Neither Reasonable Nor the Only Reasonable Interpretation

This Court has summarized the rules governing insurance policy interpretation as follows:

> Under New York law, "[t]he initial interpretation of a contract is a matter of law for the court to decide." "The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." Thus, as part of its threshold interpretation of the contract, the court must consider "whether the terms of the insurance contract are ambiguous." "When an insurance contract's provisions are 'unambiguous and understandable, courts are to enforce them as written.'" But where "an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.") In the event that "the extrinsic evidence does not yield a conclusive

-10-

answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of *contra preferentem*, which generally provides that where an insurer drafts a policy any ambiguity in the policy should be resolved in favor of the insured."

*Zurich Am. Ins.*, 206 F. Supp. 3d at 824-25 (quotations omitted).

The plain language of the ACE Policies establishes that DISH is not in the broadcasting or telecasting business and, accordingly, Exclusion j is inapplicable. *See* discussion *infra*, §I.B.1. At a minimum, Exclusion j generally, and the business of broadcasting or telecasting specifically, are susceptible to the interpretation proffered by DISH. Thus, even if the interpretation proffered by ACE is found to be reasonable (which it is not based on the plain language of the ACE Policies), Exclusion j is at least ambiguous. *See* discussion *infra*, at §I.B.2. To the extent the Court considers extrinsic evidence to resolve the ambiguity, that evidence clearly establishes that the parties never intended for Exclusion j to apply to DISH. *See* discussion *infra*, at §I.B.3.

1.     **The Plain Language of the ACE Policies Establishes that DISH Is Not in the Broadcasting or Telecasting Business**

When read as whole, as required, the plain language of the ACE Policies establishes that DISH is not in the broadcasting or telecasting business in two ways. *See City of New York. v. Phila. Indem. Ins. Co.*, 54 A.D.3d 709, 710 (2d Dep't 2008) ("In interpreting an insurance policy, the policy should be read as a whole.") (citation omitted); *Bailey v. Fish & Neave*, 868 N.E.2d 956, 959 (N.Y. 2007) (Contracts "should be read as a whole to ensure that undue emphasis is not placed upon particular words and phrases.") (citations omitted).

*First*, the Declaration Pages of each ACE Policy contains a "Business of Insured" provision that expressly describes DISH's business. SUMF ¶¶159-165. With every opportunity and reason to do so, ACE never described DISH's business as "broadcasting" or "telecasting."

SUMF ¶¶159-165, 252-53. Instead, ACE expressly described DISH's business in various other non-broadcasting ways:

- The first three ACE Policies, for the periods of August 1, 2004 through August 1, 2007, describe DISH's business as "Cable and Other Pay Television Services." SUMF ¶161.

- The next two ACE Policies, for the periods of August 1, 2007 through August 1, 2009, describe DISH's business as "Paid Television Provider." SUMF ¶162.

- The remaining ACE Policies, including the operative 2011 ACE Policy, describe DISH's business as either "Communication" or "Communications." SUMF ¶163.[3]

Thus, the ACE Policies expressly describe DISH's business as either "Pay-Television" or equipment manufacturer.

*Second*, the Declaration Pages of the ACE Policies further describe the nature of DISH's business through various industry Class Codes, including the Standard Industrial Classification ("SIC") and Insurance Services Office ("ISO") General Liability ("GL") Codes. SUMF ¶¶159, 166-68, 172-73. For example, the ACE Policies expressly describe DISH's business with SIC Code 3663 and ISO GL Class Code 59695. SUMF ¶¶169-73. Those codes are assigned to manufacturing businesses. SIC Code 3663, for example, is entitled "Radio and Television Broadcasting and Communications Equipment," and carries the following description: "Establishments primarily engaged in manufacturing radio and television broadcasting and communications equipment." SUMF ¶170. ISO GL Class Code 59695 is entitled, "Telecommunication Equipment Mfg." and carries the following description:

---

[3] A document maintained in and produced from ACE's underwriting file describes the "Communications" industry as follows:



SUMF ¶164.

> This classification applies to risks engaged in the manufacturing, of telecommunication products of all kinds including any telecommunication devices, equipment, accessories, apparatus and related parts.
>
> This classification includes installation, service or repair of telecommunication products sold to others by the insured. Leasing of such equipment either on a long term or short term basis is also included.

SUMF ¶171. Thus, once again through the assignment of Class Codes, ACE described DISH as being engaged in the manufacture and installation of equipment business.

While there are specific industry codes for the business of broadcasting, such as SIC Code 4833 and ISO GL Code 98597, ACE never described DISH's business through the use of those broadcasting codes. SUMF ¶¶174-75.

The fact that these descriptions of DISH's business were included in the Declaration Pages of the ACE Policies only reinforces the importance of those descriptions. *See Frank v. Reassure Life Ins. Co.*, 548 F. App'x 706, 708-09 (2d Cir. 2013) ("'recogniz[ing] the important role that declarations sheets play in informing an insured about the parameters of insurance coverage,' as 'the one page most likely to be read and understood'") (quoting *Pizzullo v. N.J. Mfrs. Ins. Co.*, 952 A.2d 1077, 1090 (N.J. 2008)) (alteration in original).

These explicit descriptions of DISH's business within the Declaration Pages of the ACE Policies completely contradict ACE's contention that the business of broadcasting or telecasting, referred to in Exclusion j, includes DISH's business. With every opportunity to do so, the ACE Policies never describe DISH's business as broadcasting or telecasting. To the contrary, the ACE Policies expressly describe DISH's business as something other than broadcasting or telecasting.

Finally, ACE's contention that DISH is in the broadcasting or telecasting business simply because DISH "broadcasts" television programming is belied entirely by the definition of "advertisement" in the ACE Policies. "Advertisement" is defined as "a notice that is **broadcast**

-13-

or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters." SUMF ¶97 (emphasis added). Although "advertisement" is defined as "a notice that is broadcast," ACE's representatives agreed that the mere "broadcast" of a notice does not render someone in the business of broadcasting. SUMF ¶98.

ACE's representatives acknowledged further that many businesses broadcast television programming without being in the business of broadcasting. SUMF ¶¶94-96. In one of many examples, an ACE claim handler responsible for the DISH account testified as follows:

> Q. And again, does the exclusion apply to broadcasting or insureds whose business is broadcasting?
> A. It says whose business is broadcasting.
>
> *     *     *     *
>
> Q. You could broadcast something or information without being in the business of broadcasting?
> A. Yes.

SUMF ¶94.

### 2.    Exclusion j Is at Least Ambiguous

Insurance policy language is ambiguous when it "'is susceptible to two reasonable interpretations.'" *Zurich Am. Ins.*, 206 F. Supp. 3d at 825 (quotation omitted). The ambiguity determination is made "objectively" from the perspective of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* (quotation omitted). *See also Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 594 F. App'x 700, 703 (2d Cir. 2014) (same). Accordingly, "evidence of custom and usage is properly considered prior to the evaluation of extrinsic evidence." *Beazley Ins. Co., Inc. v. ACE Am. Ins. Co.*, 197 F. Supp. 3d 616, 623 (S.D.N.Y. 2016), *aff'd*, 880 F.3d 64 (2d Cir. 2018).

To succeed in this case, ACE must establish that the businesses of broadcasting and telecasting in the context of Exclusion j can only be interpreted reasonably in the manner that ACE suggests and, necessarily, includes DISH's DBS, MVPD business. Contrary to ACE's contention, the businesses of broadcasting and telecasting are separate and distinct from the pay-TV, DBS, MVPD business. As discussed below, even if the businesses of broadcasting and telecasting, as those terms are used in Exclusion j, could be reasonably interpreted to include DISH's pay-TV, DBS, MVPD business, DISH's interpretation remains reasonable. Accordingly, Exclusion j, and the embedded references to the businesses of broadcasting and telecasting, are at least ambiguous.

### a.   The Businesses of Broadcasting and Telecasting Are Susceptible to Being Defined in Multiple Reasonable Ways

None of the businesses referenced in Exclusion j, including broadcasting and telecasting, are defined in the ACE Policies. *See, e.g.*, Epstein Dec., Tab 14. Absent a definition in the ACE Policies, consultation of dictionary definitions is warranted. *See 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) ("'[I]t is common practice for the courts of [New York] to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.'") (quoting *Mazzola v. Cnty. of Suffolk*, 143 A.D.2d 734, 735 (2d Dep't 1988)).

The American Heritage® Dictionary of the English Language (4th Ed., 2000) defines "broadcast" as:

> **Broadcast** *v*. **1**. **To transmit (a radio or television program) for public or general use. 2.** To send out or communicate, especially by radio or television[.] **3.** To make known over a wide area; *broadcast rumors*. **4.** To sow (seed) over a wide area, especially by hand. - intr. **1a**. **To transmit a radio or television program for public or general use. b.** To be on the air[.] **2.** To participate in a radio or television program. **3.** To send a transmission or signal; transmit. *n*. **1. Transmission of a radio or television program or signal for public use. 2a.** A radio or television program[.] **b.** The duration of such a program. **3.** The act of

-15-

> scattering seed. *adj.* **1a.** Communicated by means of television or radio. **b.** Of or relating to television or radio communications[.] **2.** Widely known. **3.** Scattered over a wide area. *adv.* In a scattered manner.

Epstein Dec., Tab 69 (emphasis added).[4]

As is readily evident, the term "broadcast" can be defined in a variety of ways. "Broadcast" can be defined broadly as a verb to mean: "to send out or communicate," "to send a transmission or signal" or "to sow (seed) over a wide area." Conversely, "broadcast" can be defined more narrowly as a noun to mean the "transmission of a radio or television program or signal for public use." While DISH transmits signals, it does not engage in the "transmission of a radio or television program or signal for public use." DISH's satellite signals are transmitted only to paying subscribers, and not generally to the public. SUMF ¶¶102, 108-09, 115, 155, 193.

Thus, while the term "broadcasting" can be used as a verb to mean "transmit," that is not how the words "broadcasting" and "telecasting" are used in Exclusion j. To the contrary, Exclusion j uses the words "broadcasting" and "telecasting" as nouns, as in the "broadcasting" or "telecasting" business. As discussed throughout this brief, the broadcasting business has a clear and well understood meaning in practice and in the law and it does not include DISH's DBS, MVPD business.

ACE's denial of coverage is based erroneously on its interpretation of broadcasting as a verb to mean transmit or transmission. According to ACE, "[t]his exclusion [j] precludes coverage as DISH is involved in the broadcasting of the [Broadcasters'] signal." SUMF ¶72; *see also* Epstein Dec., Tab 6. Robert Joyce, the author of ACE's coverage denial letters, reaffirmed ACE's conclusion that DISH is in the business of broadcasting because "they broadcast." SUMF ¶74.

---

[4] The term "telecasting" is a subset of "broadcasting" and is defined by Webster's Third New International Dictionary (2002) as: "to broadcast by television." Epstein Dec., Tab 70.

Notwithstanding the manner in which ACE interpreted and applied Exclusion j in this case, the ACE representatives, including Mr. Joyce, conceded that interpreting "broadcasting" as a verb was contrary to the language of Exclusion j. In one example, an ACE representative testified as follows:

> Q. All right. Because the exclusion only applies --
> A. Yes.
> Q. -- to insureds in the business of either broadcasting or telecasting or advertising or publishing?
> A. Right.
> Q. Correct. So the exclusion doesn't say this exclusion applies to those who broadcast; correct?
> A. It's an insured whose business is advertising, broadcasting, publishing or telecasting.

SUMF ¶92.

As reflected in the plain language of Exclusion j, and as acknowledged by ACE's representatives, the Exclusion utilizes the noun forms of the terms "broadcasting" and "telecasting," as in the "business" of "broadcasting or telecasting." SUMF ¶¶48, 69, 92. Thus, even if ACE's interpretation is accepted as reasonable, Exclusion j is susceptible to more than one reasonable interpretation and is, therefore, ambiguous.

In another case involving DISH and an exclusion similar to Exclusion j, the court acknowledged that the exclusion was ambiguous because "broadcasting" is susceptible to being defined in multiple ways. In *Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*, No. 12-cv-03098, 2014 WL 1217668 (C.D. Ill. Mar. 24, 2014), the court stated:

> *Webster's Third New International Dictionary* defines the term "broadcasting" as "to send out from a transmitting station (a radio or television program) for an unlimited number of receivers" or "to send out radio or television signals." Thus, even *Webster's Third New International Dictionary* alone appears ambiguous; though DISH Network surely "send[s] out . . . television signals" when engaged in its business of providing direct broadcast satellite programming to consumers, it just as surely sends out these signals for its subscribers only, not "for an unlimited number of receivers."

-17-

*Id.* at \*9 (internal citation omitted; alterations in original). The *Travelers* court, therefore, drilled deeper into the meaning of the broadcasting and telecasting businesses by consulting a telecommunications dictionary, observing:

> In *Webster's New World Telecom Dictionary,* the term broadcast television is defined as "[t]elevision programming sent over the air to all receivers." The broadcast television definition states, "*See also* narrowcast." The Telecom Dictionary in turn defines "narrowcast" as "[r]eferring to the transmission from one device to a limited number of other devices on a network. Cable television (CATV), direct broadcast satellite (DBS), and satellite radio use narrowcast transmission, as only subscribers to various channels, especially premium channels, are able to receive those transmissions."

*Id.* (internal citations omitted). As a DBS provider, DISH, by definition, is in the "narrowcasting" as opposed to the "broadcasting" business.

### b.    As a Satellite Pay-TV DBS Provider DISH Is Not in the Broadcasting or Telecasting Business as a Matter of Law

The business of broadcasting has been the subject of significant statutory, regulatory, and court review and definition. Because Exclusion j refers to the "business" of broadcasting and telecasting—and not to broadcasting and telecasting in a vacuum—it is appropriate to consider how those businesses are understood by those engaged in, and responsible for, regulating those businesses. *See Zurich Am. Ins.*, 206 F. Supp. 3d at 825 (Ambiguity should be determined from the perspective of "'a reasonably intelligent person . . . who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'") (quotation omitted). In this regard, the business of broadcasting has a well-known meaning in the industry.

As discussed above, The Communications Act of 1934 defines "broadcasting" as the "dissemination of radio communications intended to be received by the *public*, directly or by the intermediary of relay stations." 47 U.S.C. § 153(7) (emphasis added). The designation of being in or outside of the business of "broadcasting" is vitally important because certain obligations are

-18-

imposed on those engaging in "broadcasting." *See, e.g.*, 47 U.S.C. §§ 310(b), 312(a)(7), 315, 317, 325, 503(b), 508, 509. *See also* SUMF ¶¶124-25. To that end, in 1987, the Federal Communications Commission ("FCC") distinguished broadcasting services from non-broadcasting services, concluding that a service will be classified as "broadcasting" only when it is available to "all members of the public." *Subscription Video Report and Order*, 2 FCC Rcd. 1001, ¶¶ 27, 32, 41 (1987).

Specifically, the FCC distinguished broadcasting services from non-broadcasting services as follows:

> Thus, a necessary condition for the classification of a service as broadcasting is that the licensee's programming is available to all members of the public, without any special arrangements or equipment. **On the other hand, where a licensee embarks on a communications service in a manner which permits receipt of that service only by certain members of the public, that licensee is not broadcasting.**

*Id.* at ¶27 (citation omitted; emphasis added). The FCC explained further that, "[c]onsistent with that legislative intent, licensees that take steps to prevent the general receipt of their service evidence the requisite intent that it not be received by the public and are therefore not broadcasting as defined by [The Communications] Act [of 1934]." *Id.* at ¶32.

The United States Court of Appeals for the District of Columbia Circuit, thereafter, affirmed the FCC's determination that subscription video service providers, such as DISH, are not in the business of "broadcasting." *Nat'l Ass'n For Better Broad. v. FCC*, 849 F.2d 665, 668-69 (D.C. Cir. 1988). This federal law was firmly established long before the ACE Policies were issued to DISH and, accordingly, those Policies should be interpreted in a manner consistent with that law. *See Hugo Boss Fashions, Inc. v. Fed. Ins. Co.*, 252 F.3d 608, 618 (2d Cir. 2001) ("[W]hen federal law concepts…are employed, the parties may be read as having incorporated established meanings and definitions forged in the relevant federal cases.") (citation omitted).

-19-

Four courts have addressed the meaning of the broadcasting or telecasting business in the context of an insurance policy exclusion like Exclusion j. *See Travelers*, 2014 WL 1217668, at *8-11; *W. Int'l Syndication Corp. v. Gulf Ins. Co.*, No. 04-cv-2349, 2004 WL 2580788, at *7 (C.D. Cal. Sept. 2, 2004), *aff'd*, 222 F. App'x 589 (9th Cir. 2007); *DISH Network Corp. v. Arch Specialty Ins. Co.*, 989 F. Supp. 2d 1137, 1146-51 (D. Colo. 2013), *aff'd sub nom*, *DISH Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 867-73 (10th Cir. 2014); *ACE Am. Ins. Co. v. DISH Network, LLC*, 173 F. Supp. 3d 1128, 1137-38 (D. Colo. 2016) ("*ACE*"), *aff'd on other grounds*, 883 F.3d 881 (10th Cir. 2018). The courts in both *Travelers* and *Western Int'l* accepted that broadcasting and telecasting could be interpreted reasonably as involving the dissemination of television programming to the public at large, which would exclude subscription-based businesses like DISH's. The *Travelers* court held as follows:

> Reviewing these dictionary definitions, then, it appears that "broadcasting," and therefore "telecasting," can mean any instance of sending out television signals, which DISH Network surely does. "Broadcasting," and therefore "telecasting," can also mean the narrower act of making television and radio programming available on a subscription basis to a finite number of consumers. This is the type of broadcasting and telecasting done by DISH Network. But "broadcasting," and therefore "telecasting," can also mean the dissemination of television and radio programming to the public at large. DISH Network does not engage in this type of broadcasting and telecasting.

*Travelers*, 2014 WL 1217668, at *10. *See also W. Int'l*, 2004 WL 2580788, at *7 (rejecting the insurer's reliance on the Business Exclusion in light of evidence introduced by the policyholder that it distributes television programs and was not a "broadcaster" or "telecaster" in that it did not transmit programs to the public).

While the *Arch Specialty* and *ACE* courts held, contrary to the holdings in *Travelers* and *Western Int'l*, that the exclusions at issue in those cases barred coverage, that serves only to bolster the conclusion that Exclusion j is ambiguous. *See, e.g., Lefrak Org., Inc. v. Chubb*

*Custom Ins. Co.*, 942 F. Supp. 949, 957 (S.D.N.Y. 1996) ("[T]he range and variety of judicial opinions bolsters the conclusion that the pollution exclusion here is ambiguous.").

In any event, DISH respectfully submits that *Arch Specialty* and *ACE* were wrongly decided. As an initial matter, the *ACE* court found that the holding in *Arch Specialty* was dispositive and followed that holding without any independent consideration of the issue. *See ACE*, 173 F. Supp. 3d at 1137-38.

As for *Arch Specialty*, DISH submits respectfully that the holding in that case is contrary to both Colorado and New York law and should not be followed. As discussed above, when an insurer relies on an exclusion to deny coverage, it bears the burden of proving that the underlying allegations fall "solely and entirely" within the exclusion and that there is "no other reasonable interpretation" of the exclusion. *See Barney Greengrass,* 445 F. App'x at 413. The same holds true under Colorado law, which was applied in *Arch Specialty*. *See Hecla Mining Co. v. N.H. Ins. Co.*, 811 P.2d 1083, 1090 (Colo. 1991) ("The insurer has a duty to defend unless the insurer can establish that the allegations in the complaint are solely and entirely within the exclusions in the insurance policy" and that "the exclusions are not subject to any other reasonable interpretations." ).

Notwithstanding this well-established law, the *Arch Specialty* court improperly placed on DISH the burden of proving that the exclusion in general, and the business of broadcasting and telecasting in particular, "must be defined" only in the manner suggested by DISH.

> Thus, in sum, we reject Dish's assertion that the terms "broadcasting" and "telecasting," as employed in the policies at issue, must be defined to exclude fee-for-service transmissions, such as those that Dish provides to its subscribers. To the contrary, we conclude that the commonly-understood definitions of the terms "broadcasting" and "telecasting" undoubtedly encompass Dish's transmissions.

*Arrowood*, 772 F.3d at 872.

-21-

Thus, the holding in *Arch Specialty* reflects an erroneous application of Colorado law. Under the law of Colorado that is mirrored in New York, the burden is on the insurer to prove that an exclusion is subject to "no other reasonable interpretation." Instead of placing that burden on the insurers, the *Arch Specialty* court erroneously placed on DISH the burden of proving that the insurers' exclusion "must be defined" in a manner that excludes DISH's business. This court should reject any request by ACE to follow the erroneous holding in *Arch Specialty*.

> ### 3.  The Extrinsic Evidence Establishes the Parties' Mutual Understanding that DISH Is Not in the Broadcasting or Telecasting Business

When confronted with an ambiguous insurance policy provision, the court "'may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract.'" *Zurich Am. Ins.*, 206 F. Supp. 3d at 824-25 (quotation omitted). *See also Hastings Dev., LLC v. Evanston Ins. Co.*, 701 F. App'x 40, 42 (2d Cir. 2017) ("'If a court concludes a provision in an insurance contract is ambiguous, it may consider extrinsic evidence to ascertain the parties' intent at the formation of the contract.'") (quotation omitted). "In the event that 'the extrinsic evidence does not yield a conclusive answer as to the parties' intent, a court may apply other rules of contract construction, including the rule of *contra preferentem*[.]'" *Zurich Am. Ins.*, 206 F. Supp. 3d at 825 (quotation omitted). The rule of *contra preferentem* provides that "'the ambiguity ***must*** be resolved against the insurer which drafted the contract'" and "derives from the broader *contra proferentem* principle, which holds that 'equivocal contract provisions are generally to be construed against the drafter.'" *Id*. at 826 (quotations omitted; emphasis added). Here, the extrinsic evidence confirms the parties' mutual understanding that DISH is not in the business of "broadcasting" or "telecasting."

-22-

> a. **DISH and ACE Shared a Mutual Understanding Concerning the Non-Broadcasting Nature of DISH's Business**

The ACE underwriting process begins with the receipt of a submission from an insurance broker. SUMF ¶189. Each insurance broker submission to ACE describes DISH's business under the heading of "Detailed Description of Operations." SUMF ¶191. The Detailed Description of Operations included in the insurance broker submission to ACE was taken directly from DISH's Annual Report. SUMF ¶192. ACE then cut and pasted that Detailed Description of Operations into its own internal underwriting documents. *See* chart at SUMF ¶193. In that way, DISH and ACE shared a mutual understanding that DISH was in the satellite subscription service business, and not the broadcasting or telecasting business.

Conversely, although the parties produced hundreds of thousands of pages of documents in this case (SUMF ¶54), no document describes DISH's business as broadcasting or telecasting. *See, e.g.*, SUMF ¶¶242, 247; Epstein Dec. Tabs 43, 50, 55, 57, 61-62, 65. ACE's representatives were likewise unable to identify a single instance where they verbally described DISH's business as broadcasting or telecasting. SUMF ¶277. That silence is telling.

> b. **The DISH Annual Reports Relied on by ACE State Expressly That DISH Provides Subscription Not Broadcasting Services**

Each DISH Annual Report distinguishes between DISH's "subscription" service business and the "broadcast" service business:

> ***Rules Relating to Broadcast Services.*** The FCC imposes different rules for "subscription" and "broadcast" services. We believe that because we offer a subscription programming service, we are not subject to many of the regulatory obligations imposed upon broadcast licensees. However, we cannot be certain whether the FCC will find in the future that we must comply with regulatory obligations as a broadcast licensee, and certain parties have requested that we be treated as a broadcaster. If the FCC determines that we are a broadcast licensee, it could require us to comply with all regulatory obligations imposed upon broadcast licensees, which in certain respects are subject to more burdensome regulation than subscription television service providers.

SUMF ¶104. DISH, thereby, publicly disclosed its belief that it was engaged in providing "subscription," not "broadcast," services and it was regulated by the FCC as such.

ACE's underwriters reviewed DISH's Annual Reports in connection with the underwriting of the ACE Policies and maintained a copy of DISH's Annual Reports in ACE's underwriting files. SUMF ¶196. Erwin Montoya, the underwriter of the 2011 ACE Policy, testified that DISH's Annual Reports were maintained in the ACE underwriting file for DISH because they are "important document[s]." SUMF ¶197. ACE and DISH, therefore, shared an understanding that DISH was in the business of providing "subscription," not "broadcast" services.

> **c.   The Class Codes that ACE Assigned to DISH Reflect ACE's Understanding that DISH Is Not in the Broadcasting or Telecasting Business**

ACE underwriters derive various ratings in connection with developing pricing (or premium) to be charged for the insurance to be provided. SUMF ¶198. Ratings consist of both "manual" and "loss" ratings. SUMF ¶199. The first step in an ACE underwriter's determination of the premium to charge is the development of a "manual rating." SUMF ¶200.

According to the International Risk Management Institute, a "manual rating" is defined as:

> Manual rating classifies insureds according to several identifiable characteristics and establishes a rate that can be used with all insureds within a class. Determining the correct class for an insured involves judgment *and should be done carefully*. The purpose of a classification system is to group insureds into classes so that the rate for each class reflects the exposures common to that class.

SUMF ¶201. A "manual rating" is based on Class Codes and when multiplied by applicable payroll yields a manual premium. SUMF ¶202. Class Codes are codes assigned based on an

insured's particular exposures for the purpose of classifying those exposures; they generally describe the operations of the insured. SUMF ¶203.

Class Codes are set forth in the Commercial Lines Manual ("CLM") published by ISO, a copy of which is attached to the Epstein Dec. at Tab 56. According to ISO: ███████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████ SUMF ¶207. One of ACE's corporate designees described Class Codes as a "foundation" or "foundational" of ACE underwriting. SUMF ¶205. ACE underwriters assigned ISO GL Class Codes to DISH. SUMF ¶208. In connection with the underwriting of the 2011 ACE Policy, ACE assigned 92.52% of DISH's payroll to Class Code 99650 or "Television or Radio Receiving Set Installation or Repair," as depicted in the chart copied from ACE's Manual Rating Template reproduced immediately below:



| GL Class Code | | |
|---|---|---|
| 91315 | $10,631,874 | 3.36% |
| 99938 | $13,036,703 | 4.12% |
| 99650 | $292,756,252 | 92.52% |
| | $316,424,929 | |

SUMF ¶¶214-15; Epstein Dec., Tab 61. ACE's corporate designee agreed that assigning 92.52% of DISH's payroll to Television or Radio Receiving Set Installation or Repair was consistent with his understanding of the nature of DISH's business. SUMF ¶217.

Thus, according to ACE's own internal calculation, DISH's primary business was Television or Radio Receiving Set Installation or Repair, not broadcasting or telecasting.

        **d.**     **The Hazards that ACE Associated with DISH Were Consistent with Equipment Installation and Repair Engaged in by Subscription Service Providers**

Assigning the vast majority of DISH's payroll to equipment installation and repair was also consistent with how ACE categorized the hazards or risks presented by DISH's business operations. ACE's Risk Assessment Documentation in connection with the ACE Policy that began on August 1, 2004, identifies the DISH General Liability/Products Liability Hazards/Exposure as follows: (1) "off-premises exposures will exist for installers and service technicians who are often working at private residences and business centers"; (2) "[r]epairers and service technicians could cause property damage when entering a subscriber's premises to conduct installation and service operations"; (3) "[t]echnicans could damage furniture or interior/exterior services while performing installation services"; and (4) "[t]he Product Liability and Completed Operations exposure could be 'significant,' since bodily injury or property damage claims may arise from improperly installed or repaired equipment." SUMF ¶226. ACE's description of the general liability hazards presented by DISH focused exclusively on Coverage A hazards for bodily injury and property damage associated with the installation and repair of equipment at subscriber homes. SUMF ¶225.

ACE's description of the Hazards/Exposure posed by DISH's business was taken almost verbatim from the AMBest Underwriting Guide. SUMF ¶227. ACE's corporate designee, John Nilson, explained that the AMBest Underwriting Guide is "source material for general insurance information about companies and operations and how risk may vary by line of business." SUMF ¶229. ACE underwriters are directed by ACE management to consult sources such as AMBest in developing their knowledge of certain industries and operations. SUMF ¶230.

The section of the AMBest Underwriting Guide that ACE relied on, and copied directly into documents it prepared in connection with its underwriting of the DISH account, concerned

Cable Television System Operators, rather than the section for Television Broadcasting Stations. SUMF ¶235. While still early in the development of satellite television, the AMBest Underwriting Guide relied on by ACE made clear that satellite was a competitor of cable: ███

████████████████████████████████████████████████████

███████████████████████████████ SUMF ¶232. Conversely, the AMBest Underwriting Guide also made clear that Cable and Broadcast Television were distinct businesses that were often at odds: ██████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

SUMF ¶233.

**e.      ACE Previously Agreed to Defend the Interests of DISH Against Claims Alleging "Personal and Advertising Injury"**

ACE's course of dealing and performance are relevant to the interpretation inquiry. *See Stone Key Partners, LLC v. Monster Worldwide, Inc.*, 333 F. Supp. 3d 316, 324 (S.D.N.Y. 2018) (Where a contract term is ambiguous, a court may consider "'any relevant course of dealing and course of performance.'") (quotation omitted); *Barnes v. Am. Int'l Life Assurance Co. of N.Y.*, 681 F. Supp. 2d 513, 521-22 (S.D.N.Y. 2010) (In determining the parties' intent when a contract is ambiguous, "the court is to look to the contract as a whole and the parties' conduct, as well as any evidence of surrounding facts and relevant circumstances, industry custom and practice, and course of dealing.") (citations omitted). In this regard, even though Coverage B claims for "Personal and Advertising Injury" against DISH were rare, ACE agreed to defend the interests of DISH against the assertion of such claims in two prior cases. SUMF ¶¶271-76. ACE's agreement to pay for the costs incurred by DISH in defending against those claims further undermines

-27-

ACE's current contention that Exclusion j is applicable in this case and is subject to "no other reasonable interpretation."

## II.    New York Law Governs This Action

ACE has long expressed its intent to have Colorado law applied in this insurance coverage dispute. Epstein Dec., Tabs 12, 20. Specifically, ACE has relied and will continue to rely heavily on the holdings in *ACE* and *Arch Specialty*, and the prediction of Colorado law expressed by those courts. *See* discussion *supra*, at §I.B.2.b. ACE was so intent on relying on those holdings that it breached the parties' Standstill and Tolling Agreement by filing its premature, anticipatory declaratory judgment action in the District of Colorado. SUMF ¶¶50-53.

Now that this case is situated in this Court, however, the choice of law rules of New York are applied in determining the applicable substantive law. *Tommy Lee Handbags Mfg. Ltd. v. 1948 Corp.*, 971 F. Supp. 2d 368, 375 (S.D.N.Y. 2013) (Carter, J.) (citation omitted); *Beth Israel Med., Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 582 (2d Cir. 2006) (citation omitted). The first step under New York's choice of law rules is to "determine[] whether there is an actual conflict between the laws of the relevant jurisdictions." *Tommy Lee Handbags*, 971 F. Supp. 2d at 375 (citing *Beth Israel,* 448 F.3d at 582-83). *See also Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).

An "actual conflict" exists where "the applicable law from each jurisdiction provides differing rules that have the potential to affect the outcome of the case significantly." *Tommy Lee Handbags*, 971 F. Supp. 2d at 375 (citing *Fin. One Pub. Co., Ltd. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 331 (2d Cir. 2005)). "While the Court need not determine if a conflict of law would be outcome determinative, if a court finds that the effect would be the same under either state's law, there is no actual conflict[.]" *SungChang Interfashion Co., Ltd. v. Stone Mountain Accessories, Inc.*, 12-cv-7280, 2013 WL 5366373, at *4 (S.D.N.Y. Sept. 25, 2013) (Carter, J.)

(citing *Fin. One,* 414 F.3d at 331). If there is no conflict, then the Court should apply the law of New York. *See Licci*, 672 F.3d at 157 (citations omitted); *Tommy Lee Handbags*, 971 F. Supp. 2d at 375 (citation omitted).

> **A.**    **There Is No Actual Conflict Between the Laws of New York and Colorado**

This Court is not required to undertake a full choice of law analysis because New York law mirrors Colorado law on the scope of an insurer's duty to defend and the rules governing contract interpretation. Under New York and Colorado law, an insurer is obligated to defend whenever the allegations within the underlying complaint allege potentially-covered claims. *Compare Harleysville*, 314 F. Supp. 3d at 542, *with Hecla,* 811 P.2d at 1089. In both states, the determination of whether an underlying complaint gives rise to a duty to defend requires taking the allegations contained in the complaint against the insured, liberally construing them in favor of coverage, and comparing them to the insurance policy. *See Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 141 (2d Cir. 2014); *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294, 297 (Colo. 2003).[5] Most importantly, under the law of both states, an insurer relying on an exclusion to avoid its duty to defend has the burden of establishing that: (1) the underlying allegations fall "solely and entirely" within the exclusion; and (2) the exclusion is subject to "no other reasonable interpretation." *Compare Barney Greengrass*, 445 F. App'x at 413, *with*, *Hecla*, 811 P.2d at 1090. Indeed, Colorado law on the duty to defend law borrows directly from New York law. *See Hecla*, 811 P.2d at 1088-90 (citing *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146 (2d Cir. 1989)).

---

[5] ACE agrees that New York law mirrors Colorado law on the scope of an insurer's duty to defend. *See* Epstein Dec., Tab 20 at 3 ("ACE does not disagree that the duty to defend is determined by a comparison of the pleadings in the Underlying Network Lawsuits and the ACE Policies.").

Likewise, the rules governing contract interpretation are the same under New York and Colorado law, a point that ACE does not dispute. *See* Epstein Dec., Tab 12 at 2 ("Whether appropriately decided under Colorado law…or under New York law…the same governing rules of contract interpretation apply."). Under both New York and Colorado law, the first step is for the court to determine whether the terms of the insurance policy are ambiguous, specifically, whether the language of the insurance policy is susceptible to two reasonable interpretations. *See Zurich Am. Ins.*, 206 F. Supp. 3d at 824-25; *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). If the terms of the policy are unambiguous, the court is to enforce the terms as written; if the terms of the policy are ambiguous, the court may consider extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract. *See Zurich Am. Ins.*, 206 F. Supp. 3d at 824-25 (citations omitted); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Fed. Ins. Co.*, 734 F. App'x 586, 589-90 (10th Cir. 2018). Courts have recognized that New York law on contract interpretation mirrors that of Colorado law. *See, e.g.*, *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, No 11-cv-01687, 2014 WL 1053772, at *8 n.10 (D. Colo. Mar. 19, 2014) ("New York, and Colorado law on contract interpretation is sufficiently similar to merit the application of [the forum state's] law"); *City P'ship Co. v. IR-TCI Partners V, L.P.*, 252 F. Supp. 2d 1114, 1120 n.3 (D. Colo. 2003) (recognizing the parties' agreement that "New York and Colorado apply the fundamental principles of contract interpretation in the same manner").

Because there is no actual conflict between the laws of New York and Colorado with regard to the scope of an insurer's duty to defend and contract interpretation principles, this Court need not undertake a fuller choice of law analysis and should apply the law of New York. *See Licci*, 672 F.3d at 157; *Tommy Lee Handbags*, 971 F. Supp. 2d at 375.

-30-

**B.**    **New York Law Should Be Applied in the Event the Court Concludes that There Is an Actual Conflict**

If the Court determines that there is an "actual conflict" between the laws New York and Colorado, the Court applies a "center of gravity" or "grouping of contracts" approach "to determine which state has the most significant relationship to the dispute at issue." *MacLaren Europe Ltd. v. ACE Am. Ins. Co.*, 908 F. Supp. 2d 417, 424 (S.D.N.Y. 2012) (citing *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994)), *aff'd*, 545 F. App'x 50 (2d Cir. 2013). Under this approach, courts have examined the following factors, listed in the Restatement on Conflict of Laws § 193, in the context of an insurance policy with risks spread throughout multiple states: (1) the location of the insured risk; (2) the insured's principal place of business; (3) where the policy was issued and delivered; (4) the location of the broker or agent placing the policy; (5) where the premiums were paid; and (6) the insurer's place of business. *MacLaren*, 908 F. Supp. 2d at 424 (citation omitted).[6]

Where an insurance policy covers risks in multiple jurisdictions, such as the ACE Policies, the location of the risk or the insured's domicile are afforded less weight as "'it is commonplace for courts applying New York choice-of-law rules to disregard (or at least discount) the location of the insured risk when the risk is located in two or more states.'" *Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 152 (2d Cir. 2008) (quotation omitted). In such circumstances, courts should consider "the governmental interest in the enforcement of a state's regulatory scheme in this highly-regulated area—including regulating the conduct of insurance companies doing business within the state." *Dixhuit*, 2014 WL 4230586, at *4 (citing *Zurich*, 642 N.E.2d at 1069). *See also MacLaren*, 908 F. Supp. 2d at 425 ("'Although the grouping of

---

[6] No single factor is "outcome determinative" and courts should "endeavor to 'detect and analyze what interest the competing states have in enforcing their respective rules.'" *Dixhuit v. Pruco Life Ins. Co. of N.J.*, No. 14-cv-2165, 2014 WL 4230586, at *3 (S.D.N.Y. Aug. 27, 2014) (quotation omitted).

-31-

contacts analysis is the primary analytical tool to be used in resolving choice-of-law issues

relating to contracts, strong governmental interests should be considered where such interests are

readily identifiable.'") (quotation omitted).

Given the widely dispersed Restatement factors in this case, the "center of gravity" is not

readily determined. *See MacLaren*, 908 F. Supp. 2d at 424-25. The location of ACE's risk is

spread nationally (SUMF ¶278); DISH's principal place of business is in Colorado (SUMF

¶279); the Broadcaster Lawsuits were litigated in New York and California (SUMF ¶280); lead

trial counsel for DISH in defending the Broadcaster Lawsuits and his team are located in New

York (SUMF ¶282); DISH's insurance broker is located in Colorado (SUMF ¶283); the ACE

Policies were underwritten from ACE's California and New York offices (SUMF ¶284); ACE's

principal place of business is in Pennsylvania (SUMF ¶285); and ACE relied on California law

and cites to California Department of Insurance language in disclaiming coverage (SUMF ¶286).

However, New York's governmental interest in applying its laws to the insurance policies at

issue here weighs strongly in favor of the application of New York law.

Certain of the ACE Policies, including the operative 2011 ACE Policy, are stamped

conspicuously with a notice advising that the ACE Policies are subject to the minimum standards

of the New York Insurance Law and Regulations. SUMF ¶287. That Notice is mandated by New

York insurance regulations governing policies issued pursuant to a New York "special risks

license." *See* 11 NYCRR § 16.3(a). ACE obtained a "special risk license" in order to take

advantage of the exemption from the New York State Insurance Department's filing

requirements under the New York Free Trade Zone ("NYFTZ"). *See* N.Y. Ins. Law § 6301;

SUMF ¶289. The NYFTZ's exemption allows New York authorized insurers to more effectively

compete in underwriting coverages by exempting these insurers from certain filing requirements

– *i.e.*, New York insurers can quote and bind coverage in the same real-time fashion as out-of-state carriers thus providing an economic advantage by attracting business to New York. SUMF ¶291.

As a result of issuing the ACE Policies pursuant to a special risks license, ACE is subject to a comprehensive and onerous set of regulations that establishes New York's governmental interest in regulating the conduct of insurance companies doing business within the state. Specifically, ACE is required to: (1) place and prominently display a special disclosure on each of the ACE Policies (11 NYCRR §16.3), as it did here (SUMF ¶287); (2) designate a New York Class Code on the lower left-hand corner of each policy (11 NYCRR §16.12), as it did here (SUMF ¶292); (3) ensure that its rates and policy forms "satisfy governing standards set forth in the Insurance Law and regulations" (11 NYCRR §16.0); (4) ensure that its rates "shall not be excessive, inadequate, unfairly discriminatory, destructive of competition, detrimental to insurer solvency, or otherwise unreasonable" and "maintain in its files the premium charged for each special risk and the basis for the rate or premium" (11 NYCRR §16.5); (5) obtain a special risk license (11 NYCRR §16.6); and (6) file periodic reports with the New York Department of Financial Services ("DFS") containing seventeen separate data points regarding ACE's business practices. (11 NYCRR §16.7). Each of these requirements creates a connection to New York. SUMF ¶¶288, 290, 292-95.

Most importantly, the ACE Policies were required to be "underwritten and transacted" in New York. N.Y. Ins. Law §6303(a). On this point, the regulations require that ACE "shall maintain in this State an underwriting office" which shall house the "personnel . . . making underwriting decisions" related to the ACE Policies, and that "the underwriting files" must be

located in, or accessible from, the New York office (11 NYCRR §16.9), which creates a connection to New York. SUMF ¶296.

The DFS has made clear that New York's regulatory interest is strong in governing insurance policies where an insurer takes advantage of the state's insurance laws even when the transactions only tangentially involve activities within the state. In *American International Group v. New York State Department of Financial Services*, No. 14-cv-02355 (S.D.N.Y.), New York's Attorney General, on behalf of the DFS, stated that, "[t]he operation of a business within a State is perhaps the single most fundamental basis for the State's regulation of its conduct" because "the State has a compelling interest in preserving the integrity of its markets." Epstein Dec. Tab 45 at 29. "[A] state can regulate commercial activity occurring within its borders even when none of the parties to the transactions are residents of that state" and "can require companies and individuals to submit to its regulatory authority as a condition of conducting business within the state's boarders." *Id*. As further explained by the Attorney General, New York's regulatory regime is intended "to promote the soundness and integrity of its insurance markets for the benefit of the State's economy as a whole, and to ensure that insurers, producers, and other entities doing business within the State conform to standards of financial soundness, responsibility, and honesty." *Id*. at 5 (citation omitted).

It would be inequitable for ACE to object to the application of New York law to the ACE Policies. ACE could have included a choice of law clause in the policies expressly naming the jurisdiction whose law would govern the policies. It chose not to. It now seeks to profit from the lack of clarity it created by searching among the various jurisdictions that have some connection to the policies and arguing for the one that it thinks most suits its current interests. ACE has taken economic advantage of the NYFTZ and cannot now contend that it may disregard New

-34-

York law with impunity when interpreting the ACE Policies. Accordingly, New York has the greatest governmental interest in applying its laws to the ACE Policies in the event the Court concludes there is a conflict of law. *See, e.g.*, *MacLaren*, 908 F. Supp. 2d at 425 ("[I]t is the fourth interest – regulating the conduct of insurance companies doing business in New York – that is the most significant in this case."); *Liberty Mut. Ins. Co. v. Fairbanks Co.,* 170 F. Supp. 3d 634, 647 (S.D.N.Y. 2016) ("New York has a significant interest in regulating the conduct of insurance companies doing business in New York, particularly where as in this case, the insured's risk is widespread.") (citation omitted); *Dixhuit*, 2014 WL 4230586, at *5 ("New York…has a strong interest in the interpretation of the Policy and in the conduct of insurance companies doing business in this state, and that interest cannot be overcome merely because the insured was at all times a [foreign resident].").

## <u>CONCLUSION</u>

For all the foregoing reasons, DISH respectfully requests this Court to grant its motion for partial summary judgment and order ACE to defend the interests of DISH in the Broadcaster Lawsuits by paying the defense costs incurred by DISH.


Dated: March 18, 2019                Respectfully submitted,

                                     */s/ Lee M. Epstein*
                                     Lee M. Epstein
                                     Matthew A. Goldstein (admitted *pro hac vice*)
                                     Weisbrod Matteis & Copley PLLC
                                     Two Logan Square, Suite 1925
                                     100 N. 18th Street
                                     Philadelphia, PA 19103
                                     (215) 883-7422
                                     lepstein@wmclaw.com
                                     mgoldstein@wmclaw.com

## CERTIFICATE OF SERVICE

I, Lee Epstein, hereby certify that on March 18, 2019, I electronically filed the foregoing Memorandum of Law of Plaintiffs DISH Network Corporation and DISH Network L.L.C. in support of their Motion for Partial Summary Judgment via the Court's CM/ECF system, which will send notification of such filing to the attorneys of record in this case. An unredacted copy of the foregoing document will be mailed to chambers and emailed to opposing counsel on March 19, 2019.

Dated: March 18, 2019

/s/ Lee M. Epstein
Lee M. Epstein
Matthew A. Goldstein (admitted *pro hac vice*)
Weisbrod Matteis & Copley PLLC
Two Logan Square, Suite 1925
100 N. 18th Street
Philadelphia, PA 19103
(215) 883-7422
lepstein@wmclaw.com
mgoldstein@wmclaw.com