**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/23/19

| | |
|---|---|
| **DISH NETWORK CORPORATION AND DISH NETWORK LLC,** | |
| **Plaintiffs,** | |
| **-v.-** | **16-CV-4011 (ALC)** |
| **ACE AMERICAN INSURANCE CO.,** | **OPINION & ORDER** |
| **Defendant** | |

**ANDREW L. CARTER, JR., United States District Judge:**

This case concerns the duty of an insurance company to defend its insured in a lawsuit. Plaintiffs, DISH Network Corporation and DISH Network L.L.C. (collectively, "DISH") allege that Defendant ACE American Insurance Company ("ACE") had a duty to defend DISH in a series of lawsuits involving four major television networks. ACE, on the other hand, seeks to dismiss Plaintiffs' complaint and seeks declaratory relief concerning its obligation to defend DISH. The parties submitted cross-motions for summary judgment. DISH moves for partial summary judgment with respect to Count One of its amended complaint. ACE moves for summary judgment with respect to Plaintiffs' complaint and seeks declaratory relief. For the following reasons, DISH's motion is **DENIED**, and ACE's motion is **GRANTED**.

## INTRODUCTION

DISH seeks recovery from ACE for expenses incurred in defending actions brought by the four major television networks which alleged breach of contract and various forms of copyright infringement. The parties dispute whether ACE's insurance policy with DISH covers the underlying lawsuits. Specifically, the operative question is whether DISH is in the business of

"broadcasting" or "telecasting" within the plain meaning of its general liability insurance contract with ACE. Since the Court finds, for the reasons set forth below, that DISH was indeed in the business of "broadcasting" or "telecasting," the network lawsuits fall within an exclusion to ACE's insurance policy with DISH. Therefore, ACE does not have a duty to defend DISH.

## BACKGROUND

### I. Factual Background

The following factual summary consists of only undisputed material facts ("UMF"), unless otherwise indicated. These facts are, in significant part, copied from the parties' Rule 56.1 Statements. Where the facts are subject to legitimate dispute, they are construed in favor of the non-moving party. *Tindall v. Poultney High Sch. Dist.*, 414 F.3d 281, 284 (2d Cir. 2005).[1]

In this action, DISH seeks recovery from ACE for expenses incurred in defending actions brought by the major television networks in connection with DISH's "Hopper" product, a digital video recording service whose play-back feature automatically and completely skipped advertisements within the television networks' copyrighted works. UMF ¶1. Commencing in or about May 2012, the four major television networks in the United States—ABC, CBS, Fox, and NBC—sued DISH, alleging breach of contract and various forms of copyright infringement and seeking to enjoin DISH from unlawful conduct under the Copyright Act, in particular DISH's

---

[1] The Court pauses to note that its review of the record was made considerably more onerous by parties failure to adhere to Local Civil Rule 56.1, as their statements submitted pursuant to that rule not only "ignore[] the Rule's requirement that a statement be 'short and concise'" but are "not limited to *facts* as to which it is contended that no genuine triable issue exists[,]" instead containing legal arguments and matters that are often redundant of one another and "are clearly disputed in this litigation." *Hailoo v. Disability RMS, First Unum Life Ins. Co.*, No. 14-CV-1992, 2015 WL 7575906, at *23 (E.D.N.Y. Nov. 25, 2015) (quoting *Cotterell v. Gilmore*, 64 F. Supp. 3d 406, 419 (E.D.N.Y. 2014)) (emphasis added). References to the Rule 56.1 statements are presumed to incorporate counterparty responses as well as the documents and deposition testimony cited therein. Unless otherwise indicated, a standalone citation to a 56.1 Statement represents that this Court has overruled any objections and deemed the underlying factual allegation undisputed.

marketing and distribution of the Hopper (the "Network Lawsuits"). *Id.* at ¶3. The four Network Lawsuits were:

i. *DISH Network L.L.C. v. American Broadcasting Companies, Inc., et al.*, No. 12-CV-4155 (S.D.N.Y.);
ii. *CBS Broadcasting Inc., et al. v. DISH Network Corp., et al.*, No. 12-CV-6812 (S.D.N.Y.);
iii. *Fox Broadcasting Company, et al. v. DISH Network L.L.C., et al.*, No. 12-CV-4529 (C.D. Cal.); and
iv. *NBC Studios, LLC, et al. v. DISH Network Corp. et al.*, No. 12-CV-4536 (C.D. Cal.).

*Id.* at ¶44. These Network Lawsuits were all resolved without DISH paying any monetary settlements. *Id.* at ¶45. Accordingly, DISH is no longer seeking indemnification from ACE. *Id.* at ¶46.

DISH "is in the business of providing direct-to-the-home satellite television products and services to paying subscribers." *Id.* at ¶2. According to its Articles of Incorporation, it was formed for the purpose of engaging "in the business of satellite communications, including but not limited to Direct Broadcast Satellite communications; to own, sell, hold, lease, equip, maintain and operate transmission and receiving stations and any connection between any such stations, and to transmit, signals, and all matter and things of any kind, nature, and description whatsoever that may be transmitted." *Id.*

ACE issued Excess Commercial General Liability Policy No. XSL G25531309 to DISH for the period August 1, 2011 to August 1, 2012 (the "2011 Policy"). *Id.* at ¶15. This Policy included two coverages. Coverage A was for "Bodily Injury and Property Damage Liability" and Coverage B was for "Personal and Advertising Injury." Coverage B provided that: "[ACE] will pay the insured for the 'ultimate net loss' in excess of the 'retained limit' because of 'personal and advertising injury' to which this insurance applies." *Id.* at ¶15. "Advertisement" for the purposes of Coverage B was defined as "a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting

3

customers or supporters." *Id.* at ¶61. Coverage B, however, was subject to several exclusions. The exclusion at issue here is Exclusion j ("Media Exclusion"), which provided that "[t]his insurance does not apply to: . . . 'Personal and advertising injury' committed by an insured whose business is: (1) Advertising, broadcasting, publishing or telecasting." *Id.*

After DISH tendered the Network Lawsuits for a defense, ACE denied coverage by way of four letters—one for each of the Lawsuits. *Id.* at ¶47. Among the reasons given by ACE for disclaiming coverage was that ""Exclusion j. of Coverage B [the Media Exclusion] further precludes coverage for any 'personal and advertising injury' if the insured is involved in the business of broadcasting or telecasting. This exclusion precludes coverage as DISH is involved in the broadcasting of the [Network] signal." *Id.* at ¶25. DISH and ACE dispute whether ACE relied on other Exclusions and rationales in denying DISH coverage under the 2011 Policy. *Id.* at ¶48.[2]

After ACE denied coverage, the parties entered into a standstill and tolling agreement to allow an opportunity for both sides to examine their respective positions and to determine whether there was a potential for avoiding litigation. *Id.* at ¶50. DISH alleges that ACE breached this standstill and tolling agreement by commencing an action in the United States District Court for the District of Colorado captioned *ACE American Insurance Company v. DISH Network*

---

[2] For example, the ACE Policy also contains Endorsement XS-21172 (11/06) which provides that the insurance coverage "does not apply to 'bodily injury,' 'property damage,' or 'personal and advertising injury' due to the rendering or failure to render any professional service." *Id.* at 16. DISH and ACE dispute whether ACE relied on this Endorsement in disclaiming coverage for the Network Lawsuits. *Id.* Notably, the four denial letters that ACE sent to DISH only reference two exclusions in their Discussion sections: "Exclusion a" of Coverage B for "intentional acts" and "Exclusion j" for insured involved in "the business of broadcasting or telecasting." *See* ECF 157-6 ("NBC Denial Letter"), 157-7 ("CBS Denial Letter"), 157-8 ("ABC Denial Letter"), 157-9 ("Fox Denial Letter"). Moreover, Robert Joyce, the author of the denial letters confirmed at his deposition that Exclusion j provide the "essential basis" for ACE's denials of coverage. *See* UMF ¶ 70. Nevertheless, since the Court ultimately concludes that Exclusion j of the 2011 Policy does indeed exclude DISH from coverage, the Court need not assess whether ACE properly relied on other exclusions, and whether those exclusions also exclude DISH from coverage.

*Corporation et al.*, 16-CV-1280 (D. Colo.) (the "Colorado Action"), before the expiration of the agreed-upon standstill period. *Id.* at ¶51. On October 28, 2019, the parties filed a Stipulation of Partial Voluntary Dismissal, agreeing to dismiss with prejudice Counts IV, V, and VI of DISH's Amended Complaint (ECF No. 12), which all related to ACE's alleged breach of the standstill and tolling agreement. ECF No. 172.

The parties proceeded with pre-trial discovery and, with discovery complete, submitted the cross-motions for summary judgment currently before the Court.

## II.   Procedural Background

On May 28, 2016, DISH filed a complaint against ACE seeking a declaratory judgment that ACE has a duty to defend and indemnify DISH, and for breach of contract based on the 2011 Policy. ECF No. 1. DISH filed an amended complaint on June 7, 2016, which added claims based on the alleged breach of the standstill and tolling agreement between the parties. ECF No. 12. DISH then filed a motion for a temporary restraining order and preliminary injunction seeking to enjoin ACE from pursuing the Colorado Action, and this Court heard argument on that motion on June 24, 2016. The Court then denied the preliminary injunction without prejudice due to the parties' intentions to submit additional briefing. ECF No. 100. The parties submitted additional briefing in support and in opposition to DISH's motion for a preliminary injunction. On August 10, 2017, this Court granted DISH's motion to enjoin ACE from prosecuting the Colorado Action. ECF No. 119.

ACE answered DISH's complaint on August 31, 2017 and filed a counterclaim asking for a declaratory judgment that ACE has no duty to defend and indemnify DISH in the Network Lawsuits. ECF No. 120. DISH filed its answer to ACE's counterclaim on September 21, 2017. ECF No. 121. The Court denied DISH's request for leave to file a motion for judgment on the

pleadings and ordered the parties to continue with discovery. ECF No. 134. ACE and DISH then submitted cross-motions for summary judgment on Mach 18, 2019. ECF Nos. 151, 154. The parties submitted their respective oppositions to the cross-motions on April 26, 2019. ECF Nos. 162, 165. The Court then denied the parties' request for oral argument. ECF No. 170. Finally, as noted above, on October 28, 2019, the parties submitted a stipulation of voluntary dismissal, dismissing Counts IV, V, and VI of the amended complaint (ECF No. 12), which all dealt with the alleged breach of the standstill and tolling agreement. ECF No. 172. The Court granted this stipulation of voluntary dismissal and ordered that Counts IV, V, and VI be dismissed with prejudice pursuant to Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, with each party to bear its own attorneys' fees, costs, and expenses. ECF No. 173.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any material fact and "the moving party is entitled to a judgment as a matter of law." *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting A*nderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986)) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(a). Material facts are facts that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. An issue of fact is "genuine" when a reasonable fact finder can render a verdict in the nonmoving party's favor. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted). "[T]he court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir. 1986).

"If there are cross-motions for summary judgment, the Court must assess each of the motions and determine whether either party is entitled to judgment as a matter of law." *Gen. Ins. Co.*, 2016 WL 4120635, at *4 (citing *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)). "[W]hen both sides move for summary judgment, neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc.*, 996 F.2d at 1461 (citation omitted). Instead, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 1461 (citation omitted).

"The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003) (quoting *Marvel Characters v. Simon*, 310 F.3d 280, 285–86 (2d Cir. 2002)). If the moving party meets its burden, the burden shifts to the non-moving party to bring forward "specific facts showing a genuine issue for trial." *Gen. Ins. Co. of Am. v. Starr Indem. & Liab. Co.*, No. 14-CV-7354, 2016 WL 4120635, at *4 (S.D.N.Y. July 22, 2016) (citation omitted); *see also* Fed. R. Civ. P. 56(c). The non-moving party "may not rest upon mere allegation[s] or denials of his pleadings," *Anderson*, 477 U.S. at 259. Rather, the non-moving party must "designate specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986), and these facts must be "admissible in evidence." *Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) (quoting Fed. R. Civ. P. 56(e)). "The mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment," *Anderson*, 477 U.S. at 247

(emphasis in original), and "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 50 (internal citations omitted).

## DISCUSSION

### I.    Choice of Law

ACE argues that Colorado law should apply. *See* ACE American Insurance Company's Memorandum of Law in Support of Motion for Summary Judgment (ECF No. 156) at 6–8 (hereinafter "Def Memo."). DISH argues that New York law should apply. *See* Memorandum of Law of Plaintiffs in Support of Their Motion for Partial Summary Judgment (ECF No. 158) at 28–35 (hereinafter "Pl Memo.").

### A.  Standard of Review

"A federal court sitting in diversity jurisdiction applies the choice of law rules of the forum state." *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). "Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures*, 683 F.3d at 433; *see also In re Allstate Ins. Co., (Stolarz)*, 81 N.Y.2d 219, 223 (1993). An actual conflict exists when the applicable law from each jurisdiction provides different substantive rules and those rules have the potential to affect the outcome of the case significantly. *Finance One Public Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 331 (2d Cir. 2005). While the Court need not determine if a conflict of law would be outcome determinative, if a court finds that the effect would be the same under either state's law, there is no actual conflict. *Id.*

"If there is such a conflict, New York law looks to the 'center of gravity' of a contract to determine choice of law." *Id.* "Under the 'center of gravity' approach, a court may consider a

number of significant contacts, including the place of contracting, the place of performance, the physical location of property that is the subject matter of the contract, and the domiciles or places of business of the contracting parties." *Id*; *see also Stolarz*, 81 N.Y.2d at 227. However, in the absence of an actual conflict, New York law will apply. *See Wall v. CSX Transp., Inc.*, 471 F.3d 410, 422 (2d Cir. 2006) ("As there is no conflict, for practical reasons, that is, for ease of administrating the case, New York, as the forum state, would apply its law.").

### B. Application of Conflicts of Law Principles

The 2011 Policy did not contain a choice-of-law clause. As such, this Court applies the choice of law rules from the forum state of New York. Applying New York choice of law rules, the first step is to determine whether an actual conflict exists between the relevant substantive law in Colorado and in New York. There are two sets of substantive rules implicated in this case: (1) rules regarding a duty to defend in insurance contracts and (2) rules regarding contract interpretation.

New York law and Colorado law are similar in regard to an insurer's duty to defend. In New York, "an insurer's duty to defend its insured arises whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy." *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 65 (1991). Similarly, in Colorado, "[a]n insurer's duty to defend arises when the underlying complaint against the insurer alleges any facts that might fall within the coverage of the policy." *Hecla Min. Co. v. New Hampshire Ins. Co.*, 811 P.2d 1083, 1089 (Colo. 1991). Moreover, "where the complaint alleges facts which would 'establish a reasonable likelihood that the alleged tortious conduct of [the insured] is excluded from coverage . . .,' the insurer may seek a declaratory judgment to determine the insured's duty to defend." *Id*. Additionally, in New York, an insurer disclaiming a duty to defend must

"demonstrate that the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and, further, that the allegations, *in toto*, are subject to no other interpretation." *Auto. Ins. Co. of Hartford v. Cook*, 7 N.Y.3d 131, 137 (2006) (citation omitted). Similarly, in Colorado, insurers disclaiming a duty to defend are required to establish that "the exemption claimed applies in the particular case, and that the exclusions are not subject to any other reasonable interpretations," and that "the allegations in the complaint are solely and entirely within the exclusions in the insurance policy." *Hecla*, 811 P.2d at 1090. In fact, in *Hecla*, a seminal case in Colorado about an insurer's duty to defend, the Colorado Supreme Court cites approvingly to, and adopts from, the Second Circuit's decision in *City of Johnstown, N.Y. v. Bankers Standard Ins. Co.*, 877 F.2d 1146 (2d Cir. 1989), which describes and details New York law. *See Hecla*, 811 P.2d at 1089–90 (citing *City of Johnstown, N.Y.*, 877 F.2d at 1149).

New York law and Colorado law are also similar in regard to contract interpretation. *See, e.g.*, *Viesti Assocs., Inc. v. Pearson Educ., Inc.*, No. 11-CV-1687, 2014 WL 1053772, at *8 (D. Colo. Mar. 19, 2014) ("New York, and Colorado law on contract interpretation is sufficiently similar to merit the application of [the forum state's] law."). In New York, "unambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court." *Universal Am. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 25 N.Y.3d 675, 680 (2015) (citation omitted). "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent or where its terms are subject to more than one reasonable interpretation." *Id.* (citations omitted). Importantly, provisions of an insurance contract "are not ambiguous merely because the parties interpret them differently." *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (1996). Instead, "the test to determine whether an insurance contract is ambiguous focuses on

the reasonable expectations of the average insured upon reading the policy and employing common speech." *Matter of Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 326–327 (1996) (citations omitted). Similarly, under Colorado law, courts must "give effect to the intent and reasonable expectations of the parties" in interpreting an insurance policy. *Hoang v. Assurance Co. of Am.*, 149 P.3d 798, 801 (Colo. 2007). Moreover, courts must "enforce the plain language of the policy unless it is ambiguous. An insurance policy is ambiguous if it is susceptible to more than one reasonable interpretation." *Id.* "[A] mere disagreement between the parties concerning interpretation of the policy does not create an ambiguity. To determine whether a policy contains an ambiguity, we must evaluate the policy as a whole." *Cary v. United of Omaha Life Ins. Co.*, 108 P.3d 288, 290 (Colo. 2005).

ACE does not identify any conflict between New York and Colorado law regarding an insurer's duty to defend or regarding contract interpretation. Instead, ACE alleges that "DISH filed this action in New York seeking a different outcome than achieved in *Arch Specialty*, *Arrowood*, and *DISH I*—to avoid the adverse precedent of *Arrowood*." ACE's Memorandum of Law in Opposition to DISH's, and in Further Support of ACE's, Motion for Summary Judgement (ECF No. 162) at 26–28 (hereinafter, "Def Opp. Mem."). This alleged forum shopping is not enough to establish a "conflict" between the *substantive* contract and insurance laws in Colorado and New York. Instead, this is a reframed preclusion argument. As the Second Circuit has made clear, courts need not "apply the relevant substantive rules of each jurisdiction to the facts of the case and determine what the various results would be and whether they would differ." *Fin. One Pub. Co. v. Lehman Bros. Special Fin.*, 414 F.3d 325, 332 (2d Cir. 2005). Instead, the question is whether the underlying substantive law is in conflict. *Id.* at 331. And if it is not—as is the case here—then the application of that substantive law to the facts of a case cannot create an "actual conflict."

Since New York and Colorado do not provide different substantive rules that have the potential to affect the outcome of the case, New York law applies. *See Wall*, 471 F.3d at 422.

## II. The Media Exclusion and DISH's Claims

The operative question in this case is whether the Media Exclusion in ACE's insurance policy with DISH covers DISH's claim. More specifically, if DISH is in the business of "broadcasting" or "telecasting" under the plain meaning of the 2011 Policy, then the Network Lawsuits fall under the Media Exclusion and ACE does not have a duty to defend DISH.[3]

### A. Legal Standard

Applying New York law, when interpreting an insurance contract, courts look to whether the plain meaning of the terms in the contract are "ambiguous." "[U]nambiguous provisions of an insurance contract must be given their plain and ordinary meaning, and the interpretation of such provisions is a question of law for the court." *Universal Am. Corp.*, 25 N.Y.3d at 680 (citation omitted). "[A]mbiguity exists where the terms of an insurance contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Parks Real Estate Purchasing Grp. v. St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 42 (2d Cir. 2006) (internal citations omitted). Importantly, "'it is common practice for the courts of [New York] State to refer to the dictionary to determine the plain and ordinary meaning of words to a contract.'" *10 Ellicott*

---

[3] As noted in footnote two, to the extent ACE relied on other exclusions in the 2011 Policy— including Endorsement 19's Exclusion of "Broadcasting Services"—to deny its duty to defend DISH, it is unnecessary for the Court to rule on these additional bases for exclusion since the Court finds in favor of ACE for the purposes of the Media Exclusion. Moreover, for over three years, the parties have litigated this case as turning on whether the Media Exclusion applied. Any other basis for denial is not fully and properly briefed before this Court.

*Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 120 (2d Cir. 2011) (quoting *Mazzola v. Cnty. of Suffolk*, 143 A.D.2d 734, 735 (2nd Dep't 1988)).

"If the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and it may then award summary judgment." *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002) (citations and quotation marks omitted). However, "contract claims are generally not subject to summary judgment if the resolution of a dispute turns on the meaning of an ambiguous term or phrase." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011); *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998) ("If the court must resort to extrinsic evidence to ascertain the correct and intended meaning of a term, material questions of fact necessarily exist . . . . Consequently, only where the court finds that the terms are unambiguous, or where no extrinsic evidence exists, may it properly grant summary judgment to one of the parties.").

## B. Similar Cases in Other Jurisdictions

Three other federal courts have considered whether DISH is a "broadcaster" or "telecaster" for purposes of an insurance contract. ACE argues that these decisions are either binding precedent or that the doctrine of collateral estoppel precludes DISH from re-litigating this issue.

### i.    These Decisions are Not "Binding Precedent"

In *DISH Network Corp. v. Arch Specialty Ins. Co.*, 989 F. Supp. 2d 1137 (D. Colo. 2013), the court held that "the plain meaning of broadcasting includes the business of providing satellite television programming, in which DISH is primarily engaged." *Id.* at 1147–48. Next, in *Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*, 2014 WL 1217668 (C.D. Ill. Mar. 24, 2014), the court disagreed with the *Arch Specialty* court and held that DISH was not a broadcaster or

telecaster for the purposes of a similarly-worded insurance agreement. Then, the Tenth Circuit affirmed the holding of the *Arch Specialty* court in *DISH Network Corp. v. Arrowood Indem. Co.*, 772 F.3d 856, 867–73 (10th Cir. 2014), holding that "the commonly-understood definitions of the terms 'broadcasting' and 'telecasting' undoubtedly encompass Dish's transmissions." *Id.* at 872. Finally, in 2016, in a dispute between these same parties, the District of Colorado held that the Tenth Circuit's opinion in *Arrowood* was binding and thus that "the broadcasting and telecasting exclusion in [DISH's contract with ACE] excludes DISH from coverage." *ACE Am. Ins. Co. v. DISH Network*, LLC, 173 F. Supp. 3d 1128, 1137–38 (D. Colo. 2016) ("*DISH I*").[4]

ACE argues that the holdings in *Arch Specialty* and *Arrowood* are "binding precedent that appl[y] equally to the same ACE Policy at issue in this case." This Court disagrees, especially since it has already determined that it is applying New York law to the interpret the 2011 Policy. Moreover, "federal courts have an obligation to engage in independent analysis, with binding precedent set only by the Supreme Court and the Court of Appeals for that circuit." *Ctr. Cadillac, Inc. v. Bank Leumi Trust Co. of N.Y.*, 808 F. Supp. 213, 224 (S.D.N.Y. 1992) (citation omitted). None of the previous decisions on this issue are from either the Supreme Court or the Second Circuit. While the Court finds *Arch Specialty* and *Arrowood* persuasive, and ultimately agrees with their conclusions, these decisions are not binding on this Court.

## ii. Collateral Estoppel Does Not Apply

ACE argues that the decisions in *Arch Specialty*, *Arrowood*, and *DISH I* preclude DISH from litigating the issue of whether it is in the business of "broadcasting" or "telecasting." Def Opp. Mem. at 4 ("[The] factual and legal predicates underlying DISH's 'not in the business of

---

[4] This decision was affirmed by the Tenth Circuit on other grounds. *See ACE Am. Ins. Co. v. DISH Network, LLC*, 883 F.3d 881 (10th Cir. 2018).

broadcasting' opposition to the Media Exclusion's application been considered at length and decisively rejected, [thus] collateral estoppel will preclude [DISH] from re-litigating in a subsequent action the same issue necessarily decided in a prior action."). This Court first notes that after over three years of litigating this case, ACE first raises the issue of collateral estoppel in its Opposition Memorandum. ACE should have raised this issue in its moving briefing to provide DISH an opportunity to respond. Nevertheless, ACE's collateral estoppel arguments are unpersuasive.

Issue preclusion bars litigation of an issue when: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party has a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Ball v. A.O. Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (internal quotation marks omitted). "The burden of showing that the issues are identical and were necessarily decided in the prior action rests with the party seeking to apply issue preclusion." *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996). Moreover, a district court "is generally accorded wide discretion to determine when offensive collateral estoppel should be applied." *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1486 (2d Cir. 1995).[5]

As ACE notes, the principal aims of the collateral estoppel doctrine are to promote judicial efficiency and to avoid inconsistent rules of decision. *See* Def Opp. Mem. at 5; *Envtl. Def. v. EPA.*, 369 F.3d 193, 202 (2d Cir. 2004) ("The doctrine serves to 'relieve parties of the cost and vexation

---

[5] The Court pauses to note that the Supreme Court and Second Circuit have differentiated between offensive and defensive collateral estoppel. *See, e.g., Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330 (1979). In this case, since ACE brought a counterclaim against DISH on the operative issue, "offensive and defensive collateral estoppel are functionally the same." *Stonewell Corp. v. Conestoga Title Ins. Co.*, No. 04-CV-9867, 2009 WL 10695617, at *6 (S.D.N.Y. Sept. 29, 2009).

of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication.'" (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)). Here, as for judicial efficiency, "the issues have already been fully briefed and argued, so judicial efficiency would not be served by estopping [DISH] from proceeding." *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 406 n.5 (2d Cir. 2018). As for the risk of inconsistent rules of decision, since the Court ultimately agrees with the holdings of the Tenth Circuit and the District of Colorado, the risk of inconsistent holdings is largely mitigated. Moreover, as the parties acknowledge, the judgments in *DISH I* and *Arch Specialty* are already in conflict with the judgment of the District of Illinois in *Travelers Prop.* In fact, the *Travelers Prop.* court expressly acknowledged that its decision was at odds with the analysis of the *Arch Specialty* court. *See Travelers Prop.*, 2014 WL 1217668 at *11. Thus, neither of the principal purposes of the collateral estoppel doctrine would be served by applying it here.

Additionally, the courts in *Arch Specialty*, *Travelers Prop.*, and *Arrowood* were interpreting different underlying contracts between different parties. Although the language of the insurance agreements and the exclusions were indeed similar, principles of contract interpretation provide that this court must analyze terms of an agreement in "the context of the entire integrated agreement." *Parks Real Estate*, 472 F.3d at 42 (internal citations omitted). This analysis is necessarily different if the underlying contracts are different.[6] Thus, the best case for collateral estoppel is *DISH I*, which involves the same parties and an identical insurance provision. The *DISH I* court, sitting as a district court in the Tenth Circuit held that "[t]his court is bound by the

---

[6] If this were not the case, the Court in *DISH I* could have similarly applied the doctrine of collateral estoppel. Instead, the *DISH I* court noted the differences in the contracts between those in *Arrowood* and those before the court in *DISH I*, and then determined that these differences did not impact the binding effect of the Tenth Circuit's *Arrowood* holding.

holding in *Arrowood*." *ACE Am. Ins. Co.*, 173 F. Supp. 3d at 1138. As discussed above, however, this Court is *not* bound by the holding in *Arrowood*, and is also applying New York substantive law as opposed to Colorado law. Thus, this Court is free to construct the 2011 Policy under New York law, and is free to engage in this construction outside the confines of the Tenth Circuit's decision in *Arrowood*. Finally, the underlying lawsuits in *DISH I* are distinct from the Network Lawsuits, and these distinctions can impact the Court's analysis and interpretation of the scope of the 2011 Policy.

Finally, even assuming that the four prongs of collateral estoppel are met, courts must still conduct a fairness analysis before applying the doctrine. *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. at 331, 99 S.Ct. 645 ("[W]here ... the application of offensive estoppel would be unfair to a defendant, a trial judge should not allow [it]."); *see also Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 84 (2d Cir. 2019). Although the Second Circuit has not catalogued all of the factors to consider in this "fairness" analysis, these factors include: whether "the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant," *see Parklane Hosiery*, 439 U.S. at 330; and whether "the defendant had little to no incentive to raise [the issue] in the earlier action." *Marcel Fashions Grp. v. Lucky Brand Dungarees, Inc.*, 898 F.3d 232, 240 (2d Cir. 2018). Here, these factors counsel against applying the doctrine of collateral estoppel. First, as acknowledged by the parties here and by the court in *Travelers Prop.*, the judgments in *DISH I*, *Arch Specialty*, and *Arrowood* are in conflict with the judgment of the District of Illinois in *Travelers Prop.* Second, the court in *DISH I* was bound by the precedent of the Tenth Circuit in *Arrowood*, while this Court is not. This means that DISH may have had less incentive to raise many of the argument it does before this Court (or, had an incentive to raise different arguments centered around distinguishing *Arrowood*).

## C. **The Media Exclusion**

The 2011 Policy covers "Personal and Advertising Injury," which includes, in pertinent part: "[i]nfringing upon another's copyright, trade dress or slogan in your 'advertisement.'" UMF at ¶61. This coverage, however, is subject to several exclusions, including Exclusion j, which provides that "[t]his insurance does not apply to: . . . 'Personal and advertising injury' committed by an insured whose business is: (1) Advertising, broadcasting, publishing or telecasting." *Id.* Thus, the threshold question is whether the terms "insured whose business is . . . broadcasting . . . or telecasting" are ambiguous in the 2011 Policy. Although DISH and ACE disagree on the definitions of these terms, the terms "are not ambiguous merely because the parties interpret them differently." *Mount Vernon Fire Ins. Co. v. Creative Hous.*, 88 N.Y.2d 347, 352 (1996).

### i. **The Dictionary Definition**

The 2011 Policy does not expressly define "broadcasting" or "telecasting," and it does not indicate any agreement between the parties that these terms have special meaning outside of their common usage. *See Mostow v. State Farm Ins. Companies*, 88 N.Y.2d 321, 326 (1996) ("Although the common understanding of the insurance industry and the legal profession may well be [technical definition] . . . the test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech.") (citations omitted). Where the 2011 Policy intends to adopt a statutory definition of a term, it does so explicitly. For example, Exclusion s.(4)(c) indicates that terms such as "source material" and "special nuclear material" should "have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof." Similarly, the Policy includes a "Definitions" section that defines terms such as "Advertisement," "Bodily injury," and "Mobile

equipment." The 2011 Policy, however, does not indicate any unique or statutory definition for the terms "broadcasting" or "telecasting" in Exclusion J.[7]

Thus, as is practice under New York law, this Court turns to the dictionary to determine the plain and ordinary meaning of the terms "broadcasting" or "telecasting." *See 10 Ellicott Square Court Corp.*, 634 F.3d at 120. According to Webster's Third New International Dictionary, the word "broadcast" can be used as an adjective, a noun, a verb, or an adverb. *Broadcast*, Webster's Third New International Dictionary, Unabridged (2002). As an adjective, "broadcast" is defined as "cast or scattered in all directions . . .: widely diffused" and "made public by means of radio or television." *Id.* As a noun, "broadcast" is defined as "a casting or scattering in all directions;" "the act of making widely known: the act of spreading abroad;" and "the act of sending out sound or images by radio or television transmission esp. for general reception." *Id.* As a verb, "broadcast" is defined as "to scatter or sow;" "to make widely known: disseminate or distribute widely or at random;" "to send out from a transmitting station (a radio or television program) for an unlimited number of receivers;" and "to send out radio or television signals: speak or perform on a broadcast program." *Id.* Finally, as an adverb, "broadcast" is defined as "so as to scatter or be scattered in all directions (as of seed): so as to spread widely" and "so as to reach by radio or television transmission the greatest possible number of receiving sets." *Id.*

The definition of "telecast" largely overlaps with the definition of "broadcast." Telecast is defined as "a broadcasting or a program broadcast by television;" and "to broadcast by television."

---

[7] Notably, Exclusion J does provide some explicit limiting instructions. For example, it notes that "[f]or the purposes of this exclusion, the placing of frames, borders or links, or advertising, for you or others anywhere on the Internet, is not by itself, considered the business of advertising, broadcasting, publishing or telecasting." It would have been easy for the parties to similarly include a unique or statutory definition of the terms "broadcasting" or "telecasting" that explicitly excluded DISH's business.

*Telecast*, Webster's Third New International Dictionary, Unabridged (2002). Since the definition of "telecast" necessarily encompasses broadcasting, this Court finds that the definition of telecast in the 2011 Policy overlaps with the definition of "broadcast."[8]

Each of these definitions of the word "broadcast" encompasses DISH's business of transmitting, via broadcast satellites, television programming to its subscribers. In transmitting television programming to its subscribers, DISH makes television programming "public by means of radio or television;" DISH sends programs "from a transmitting station . . . for an unlimited number of receivers;" DISH "send[s] out radio or television signals;" and DISH transmits programs "so as to reach . . . the greatest possible number of receiving sets." Undoubtedly, and without ambiguity, DISH qualifies as a "broadcaster" as that term is generally understood and defined.

DISH argues that it is not a broadcaster because it does not transmit its television programming to the public at large for free, but instead charges a subscription fee and provides its

---

[8] The Court in *Travelers Prop.* also relied on the *Webster's New World Telecom Dictionary* to provide definitions that differed from the Webster's International Dictionary and used these differences to demonstrate ambiguity in the definitions of "broadcast" or "telecast." *See Travelers Prop. Cas. Co. of Am. v. DISH Network, LLC*, 2014 WL 1217668 (C.D. Ill. Mar. 24, 2014). This Court respectfully disagrees with the analysis of the *Travelers Prop.* court. First, courts interpreting insurance contracts in New York attempt to examine terms based on the "reasonable expectations of the average insured upon reading the policy and employing common speech." *Matter of Mostow*, 88 N.Y.2d at 326–327 (citations omitted). Since the 2011 Policy does not include any indication that a special dictionary definition should be applied to the terms "broadcast" or "telecast," the appropriate dictionary to determine the "common speech" is a general dictionary. In fact, referring to additional dictionaries may always generate different definitions, and courts run the risk of artificially creating "ambiguity" in contract terms. Moreover, even accepting the *Telecom* dictionary's definitions, DISH qualifies as a broadcaster. The Traveler's court notes that the term broadcast in the *Telecom* dictionary is defined as "[t]elevision programming sent over the air to all receivers." *Webster's New World Telecom Dictionary* 69 (Ray Horak ed., 2008). Although DISH's service is only provided to those who are willing to pay a fee, their transmissions are nevertheless capable of being "sent over the air to all receivers," and these transmissions are only limited by the number of individuals who have determined that they do not *want* to receive the transmissions because they do not want to pay the subscription fee.

service to a limited subset of receivers. This distinction is unpersuasive. The dictionary definitions of the term "broadcast" do not delineate between entities who broadcast to the public at large, for free, and entities who broadcaster to a more limited set of the public, at a cost. As the *Arch Specialty* court noted, "[i]t is enough for the broadcast or telecast to be readily available to the public at large, and certainly DISH strives for universal access." *Arch Specialty*, 989 F. Supp. 2d at 1147. The plain and ordinary meaning of the terms "broadcast" and "telecast" encompass a subscription-based broadcasting service. *See Arrowood Indem. Co.*, 722 F.3d at 871 ("Even assuming that the terms 'broadcasting' and 'telecasting' include a 'public' component, nothing in any of these common definitions of the terms exclude fee-for-service transmissions."). Moreover, DISH shares many of the characteristics of traditional broadcasting, "including its primary one— i.e., transmissions are directed towards as many people as can be interested in the particular program as distinguished from a point-to-point message service to specified individuals." *Id.* (citations and internal marks omitted).

### ii.  **DISH's Arguments to Discard the Dictionary Definition**

DISH provides several additional arguments for why, when the 2011 Policy is read as a whole, the dictionary definitions discussed above should not apply. First, DISH argues that the allegations in the underlying Network Lawsuits expressly distinguish between the broadcasting business and non-broadcasting businesses, *see* Pl Memo. at 7–10; second, that the "Declaration Pages" of the ACE Policy contain a "Business of Insured" provision and industry classification codes that do not describe DISH's business as "broadcasting," *see id.* at 11–14; and third, that the

FCC and the Federal Communications Act expressly exclude DISH from their definition of a "broadcaster," *see id.* at 18–22.[9] Each of these, however, is unpersuasive.

The characterization of DISH's business in the underlying Network Lawsuits is irrelevant. Exclusion j relates to DISH's conduct and business, not to the conduct alleged by third parties. The underlying suits were based on the Copyright Act, which does indeed distinguish between a "broadcast station," a "cable system," and a "satellite carrier." 17 U.S.C. § 501. However, it would be inappropriate for this Court to use the allegations from the Network Lawsuits to create ambiguity in DISH's policy with ACE, especially when the 2011 Policy did not indicate any relevance for the allegations of an underlying lawsuit. Exclusion j turns on whether DISH was in the business of "broadcasting" or "telecasting," not whether the four major television networks alleged that DISH was in the business of "broadcasting" or "telecasting."

DISH's reliance on the "Business of Insured" provision and the industry-specific classification codes in the 2011 Policy are also unpersuasive. The Policy's "Business of Insured" provision did not describe DISH's business as "broadcasting" or "telecasting." UMF ¶164. However, there is no indication in the Policy that this classification by ACE—which was chosen from the "five or six industries that you can pick from"—had any import in constructing the terms of Exclusion j. *Id.* at ¶160. Similarly, as the Tenth Circuit noted in response to DISH's

---

[9] DISH and ACE also provide a number of additional arguments based on extrinsic evidence. Since the Court finds that the definition of "broadcaster" or "telecaster" are not ambiguous, it is improper for the Court to resort to extrinsic evidence or the purposes of *creating* ambiguity in the definition of these terms. *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, England*, 136 F.3d 82, 86 (2d Cir. 1998). Thus, DISH and ACE's arguments that incorporate extrinsic evidence—including arguments related to the underwriting of the 2011 Policy and DISH's public statements characterizing itself as a broadcaster—cannot and should not be considered by this Court. Each of the three arguments discussed above relate to the 2011 Policy itself, and the Court must consider the policy as a whole when determining the definition of particular terms within the policy.

classification codes argument: "Dish presents no evidence or case law that would allow us to conclude that the classifications found within the SIC system are so well known or commonly employed that they can serve to define a term in a commercial general liability policy." *Arrowood*, 772 F.3d at 870. This is especially true when the 2011 Policy does not indicate that the industry classification codes had any import to constructing the terms of Exclusion j.

Finally, DISH's reliance on the Federal Communications Act's definition and the FCC's regulatory apparatus are also unpersuasive. The definitions that the FCC and FCA ascribe to broadcasting or telecasting, unless expressly incorporated into the Policy itself, do not shed light on the plain meaning of the terms. The Court must read the 2011 Policy "in light of 'common speech' and the reasonable expectations of a businessperson," not the definition proscribed by the FCC or the FCA. *Belt Painting Corp. v. TIG Ins. Co.*, 100 N.Y.2d 377, 383 (2003) (citation omitted). DISH presents no case law or evidence that the definitions of the terms "broadcast" or "telecast" used in a narrow, statutory or regulatory context should control in constructing the terms of a general liability insurance policy. *See Arrowood Indem Co.*, 722 F.3d at 871 ("the Act's statutory definition of 'broadcasting' and the FCC's interpretation and application of that statutory definition carry little weight in a case such as this, where our focus is on the commonly understood definition of the term 'broadcasting.'"). Moreover, the terms "broadcasting" and "telecasting" are included alongside the terms "advertising" and "publishing" in the 2011 Policy. It would strain the ordinary reading of the contract to read the terms "broadcasting" and "telecasting" as having specific, narrow statutory definitions while the other terms are defined by their dictionary definition.

    iii.    **The Doctrine of *Contra Proferentem***

Finally, DISH places emphasis on the doctrine of *contra proferentem*. "Resolving the ambiguity against the insurer who drafted the contract is the doctrine of contra proferentem." *Catlin Speciality Ins. Co. v. QA3 Fin. Corp.*, 36 F. Supp. 3d 336, 341 (S.D.N.Y. 2014). However, as the Second Circuit has noted, this doctrine is one of last resort, and should not be applied unless terms in the contract remain ambiguous. *See Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 (2d Cir. 1983) ("The trial court erroneously invoked this doctrine because *contra preferentem* is used only as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument."). Indeed, if the Court found that the terms "broadcaster" and "telecaster" as used in the 2011 Policy were subject to more than one reasonable interpretation, then any ambiguity should be constructed against ACE. Here, however, the words of the Policy, as constructed in their ordinary and plain use, are not ambiguous. Therefore, it would be improper for the Court to turn to extrinsic evidence to *create* ambiguity, and to then turn to the doctrine of *contra preferentem* to resolve this artificially created ambiguity in favor of DISH.

## CONCLUSION

For the reasons stated above, ACE's motion is **GRANTED** with respect to its counter-claim for a declaratory judgment that ACE is not obligated to defend DISH in the underlying Network Lawsuits and DISH's claims are **DISMISSED**. The Court respectfully directs the Clerk of the Court to terminate the motions at ECF Nos. 151 and 154 and to close the case.

**SO ORDERED.**

Dated: December 23, 2019
      New York, New York

                              **ANDREW L. CARTER, JR.**
                              **United States District Judge**